GUST K. NEWBERG CONSTRUCTION, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (James McDonald, Appellee).

Third District (Industrial Commission Division)   No. 3—91—0774WC

Opinion filed June 11, 1992.

Richard B. Levy and Gerald J. Porento, both of Commonwealth Edison Company, of Chicago, for appellant.

Noel C. Lindenmuth, Richard A. Kimnach, and John A. Salzeider, all of Anesi, Ozmon & Rodin, Ltd., of Chicago, for appellee.

JUSTICE HENRY LEWIS delivered the opinion of the court:

Claimant, James McDonald, filed two applications for adjustment of claim pursuant to the Workers' Compensation Act (Ill. Rev. Stat. 1987, ch. 48, par. 138.1 *et seq.*), for two injuries incurred while employed by two separate employers. The first injury was incurred on April 8, 1987, while the claimant was employed by the respondent, Gust K. Newberg Construction (Newberg). The second injury was incurred on January 5, 1988, while he was employed by Midway Industrial Contractors, Inc. (Midway). The claimant filed section 19(b—1) (Ill. Rev. Stat. 1987, ch. 48, par. 138.19(b—1)) petitions in both of these cases, and the petitions were consolidated for hearing. Following the hearing on the petitions, the arbitrator found that the claimant was entitled to 109$\frac{3}{7}$ weeks of temporary total disability (TTD) and to medical expenses in the amount of $31,793.50, and that the claimant's condition of ill-being resulting from his left knee and cervical injuries was causally connected to his accident of April 8, 1987. Newberg, the only employer involved in this appeal, appealed the arbitrator's decision to the Industrial Commission (Commission). The Commission modified the arbitrator's decision by reducing the claimant's TTD to 103$\frac{3}{7}$ weeks but otherwise affirmed the arbitrator's decision. On appeal to the circuit court, the court determined that the Commission's decision was not against the manifest weight of the evidence and confirmed the Commission's decision. Newberg appeals.

On appeal, Newberg contends that the Commission's determination that the claimant's condition of ill-being was causally connected to his work accident of April 8, 1987, was against the manifest weight of the evidence. Specifically, Newberg asserts that the intervening accident of January 5, 1988, broke the causal connection between his accident of April 8, 1987, and his condition of ill-being regarding his cervical and left-knee injuries. Newberg further asserts that, since the claimant stopped working only after the second acci-

dent, his benefits and medical expenses incurred after the second accident should be paid by Midway. Newberg also argues that the subsequent intervening accident in which the claimant sustained a herniated disc in his lumbar spine and two hernias was the major contributing cause of the claimant's inability to return to work, and the Commission failed to consider this factor in its determination. The second issue raised by Newberg is that the Commission erred in relying on Dr. Mash's medical report in its decision, since that report was not admitted into evidence in the case at bar.

At the hearing on his section 19(b—1) petitions, the claimant testified that he is 50 years of age, and that he has worked as a carpenter and as a painter for over 30 years. Prior to April 8, 1987, the claimant had not sustained any injury to his neck, upper extremities, low back or his lower extremities. On April 8, 1987, the claimant was employed by Newberg as a carpenter at the Braidwood Nuclear Power Plant and was helping to construct a scaffold that was 40 feet from the ground. His work on this scaffold required him to stand on a conveyor system three or four feet off of the ground and to hand lumber measuring 4 inches by 6 inches by 24 feet up to another worker on a ledge 20 feet off of the ground. The claimant estimated that the 4-inch by 6-inch by 24-foot piece of lumber weighed approximately 180 to 220 pounds. While performing this work on that date, a 4-inch by 6-inch by 24-foot piece of lumber was dropped by the person working on the ledge above the claimant and struck the claimant across the neck and the shoulder. When the lumber struck the claimant, it caused his left leg to go "through" the conveyor system upon which he was standing while his right leg swung into the side of the conveyor. Immediately after his accident, he noticed swelling in his knee and his ankle, and his neck and shoulder hurt.

Following this accident, the claimant reported his accident to his foreman and continued to work, but he did not seek medical treatment until approximately two weeks later. According to the claimant, he was able to keep working because "my partners were taking care of me." Although he continued to work, the claimant stated his condition became worse, and he could not lift anything. The claimant stated that his left arm was starting to go numb, his right arm was almost useless, and he was having trouble with both of his knees and the ankle on his left leg.

The claimant was sent to Dr. Adelmann by Newberg's company nurse. Dr. Adelmann examined him, took X rays, and prescribed Butazolidin for the claimant, but he discontinued this medication when

the claimant developed an allergic reaction. Subsequently, the claimant went to Dr. Michael Greenwald. Dr. Greenwald also examined him and took X rays, and he treated the claimant conservatively with prescribed medication, cortisone injections and physical therapy.

The claimant continued to work for Newberg for almost a month after his accident, until he was laid off work. After a month's layoff from Newberg, the claimant went to work for Midway as a painter at the Braidwood Nuclear Power Plant. The claimant worked for Midway until January 5, 1988. On that date, while carrying a bag of glass beads or sand, the claimant stepped over a drainage hose and slipped in grease from a nearby motor. When the claimant fell, he struck his lower back and felt a "real sharp pain in the groin." Later that day, the claimant developed lumps on both sides of his groin, and his lower back was injured. The claimant denied that he struck his head in this fall.

The claimant testified that he had been having progressive difficulties with his neck, shoulders, arms, left knee and left ankle, and that following his accident of January 5, 1988, he noticed no change in these areas. After his second accident, the claimant sought treatment from Dr. Rubino, his family physician, for the hernias in his groin area. Dr. Rubino performed surgery on his hernias, but the claimant treated with Dr. Greenwald for his lower back. The claimant had been seeing Dr. Greenwald prior to his accident of January 5, 1988, and he continued to see the doctor after his second accident. Dr. Greenwald had the claimant undergo an MRI (magnetic resonance imaging), a dye-injected CAT scan, and an arthrogram on his left knee. Dr. Greenwald wanted to perform surgery on the claimant's knee and then operate on his neck at a later time. However, the claimant went to Dr. Nuber, who performed surgery on his left knee in August 1988, and he went to Dr. Butler for a second opinion on his neck. Subsequently, Dr. Butler performed surgery on his neck on June 19, 1989.

The claimant testified that his current complaints consist of his arms going numb, his fingers "locking," and severe pains in his shoulder and right arm. Also, his knee wants to give out on him. The claimant stated he has numbness over his whole body, especially his lower extremities, and that he has problems with "losing my bowels on many occasions." Recently, Dr. Butler had the claimant undergo another MRI for his low-back pain.

The claimant had not worked since his accident of January 5, 1988. He had seen Dr. James Duffy on two occasions at his lawyer's request, but Dr. Duffy did not treat him. He also saw Dr. Steven

Mash at the request of Hartford Insurance, Midway's insurance carrier.

On cross-examination, the claimant admitted that he did not have lower-back pain until after the accident of January 5, 1988, and that it was not until after the March 1988 MRI that the claimant was told he had a herniated disc in his neck. He also admitted that he may have told Dr. Butler he struck his head in the accident of January 5, 1988, and that he may have told Dr. Nuber his neck hurt more after his second accident. Dr. Adelmann had told the claimant that his problem was arthritis and advised the claimant to see an "arthritis specialist." After his second accident, the claimant noticed that he had radiating pain in both of his arms, where before the accident the pain was in his one arm. The claimant stated that he had neck pain after his accident of April 8, 1987, and that he continued to have neck problems after the January 5, 1988, accident. The claimant testified that before his accident of January 5, 1988, he had problems lifting with his right arm, he had some numbness in his left arm, and he had severe problems with his left knee and ankle and right ankle.

When questioned regarding his employment at Midway, the claimant responded that his work consisted mainly of touching up defects on the painted surfaces, such as where a spot of orange paint may have gotten on a surface painted brown. He also washed down walls and metal with thinner in preparation for painting. While his work with Midway involved twisting and turning, he did not often carry bags or do heavy work. According to the claimant, the 40-pound bag he was carrying on January 5, 1988, was the heaviest item he had carried while employed by Midway. The claimant stated that he hurt when he carried the bag at Midway, but that he "had to make a living."

The claimant presented numerous medical records and two evidence depositions, one of Dr. Michael Greenwald and one of Dr. James Duffy. In Dr. Greenwald's evidence deposition taken on May 15, 1990, the doctor testified that he is an orthopedic surgeon and that he first saw the claimant on May 29, 1987. The history given to Dr. Greenwald by the claimant indicated that the claimant had had a work accident on April 8, 1987, wherein the claimant was struck by a weight on a hoist across his neck and shoulder, following which the claimant fell through a conveyor thereby injuring his left leg. Dr. Greenwald was aware that the claimant incurred an injury to his right foot and ankle nine months previous.

The claimant complained to the doctor that his left knee pained him, particularly when he drove and used a clutch. The claimant also told the doctor that he had neck pain, and that the pain was on the top of his right shoulder and burning in nature. Additionally, the claimant had weakness in his right arm with occasional pain in the musculature of the right arm. The doctor noted that the claimant complained of "frequent radiculitis, which is pain shooting down the right arm."

The doctor's examination of the claimant revealed that the claimant had about 30% of normal range of motion of the neck laterally; about two-thirds of normal range of motion in forward flexion; and about one-half of normal range of motion in hyperextension of the neck. The claimant complained of a burning sensation on right lateral flexion and on hyperextension of the neck. The doctor indicated that a burning sensation is evidence of nerve-root irritation. The doctor found the neurological evaluation of the claimant's upper extremities to be normal, which indicated there was no destructive process going on in the nervous system. The doctor's examination of the left knee revealed no effusion (fluid in the tissue), no fluid in the joint, and no instability.

Dr. Greenwald had X rays taken. The X rays of the claimant's neck showed that he had large osteophytes (bone spurs) at the C5-6 and C6-7 levels, and that the space between the C5-6 vertebrae was narrowed. According to the doctor, the narrowing of the disc space showed degenerative changes at that level with weakness and softening of the disc which permitted the disc to partially collapse. The doctor found a suggestion of preexisting damage to the right shoulder. The doctor's impression of the claimant's condition at his initial visit was that the claimant had diffuse moderate osteoarthritic problems with superimposed multiple strains, with the osteoarthritic problems as a preexisting condition prior to April 8, 1987.

The doctor next saw the claimant on June 11, 1987. The claimant's lab work was unremarkable, and his physical findings were substantially unchanged. The claimant had not responded to the medication prescribed, so the doctor changed his medication. At the next visit on June 23, 1987, the doctor noted that the claimant had modest improvement, but that his right arm was getting worse, particularly in the biceps. The doctor again changed the claimant's medication. On July 11, 1987, the claimant had not improved, so the doctor gave the claimant a steroid injection and placed him on an anti-inflammatory drug.

On August 7, 1987, the claimant complained of a brief, very severe episode of central neck pain which had lessened by the time he had seen the doctor. The claimant also complained of right shoulder pain. On August 14, 1987, the doctor noted that the claimant continued to have radicular pain into the right arm. The doctor again injected the claimant's neck with a steroid and continued him on anti-inflammatory medication. In the doctor's opinion, the radiculitis of the right arm was indicative of a nerve-root compression problem in the neck related to the pathology (the degenerative-disc disease) at the C5-6 and/or C6-7 level and the strain of the injury of April 8, 1987.

The claimant's next visit to Dr. Greenwald was on September 15, 1987. At that visit, the doctor and the claimant discussed only the claimant's knee problem as that was giving the claimant more difficulty. The doctor again saw the claimant for his left-knee problem on October 6, 1987.

On November 17, 1987, the doctor noted little change in the claimant. On November 20, 1987, the claimant had left-knee pain due to bumping it at work two days previous. The next visit with the claimant was on January 12, 1988, at which time the claimant told the doctor of his second accident on January 5, 1988. The claimant told the doctor he had been carrying a bag of sand and slipped, twisting his back. As a result of the second injury, the claimant had back pain, neck pain and right-shoulder pain. The claimant had also developed hernias from the accident. The claimant advised the doctor that he had not worked since January 5, 1988. The doctor was aware that the claimant's greatest problems were pain in his left knee and his right shoulder; however, because the claimant was to be off work six weeks following his hernia operation, the doctor thought the time off would be beneficial for his neck and knee injuries.

The doctor saw the claimant again on February 16, 1988. At that time, the claimant had persistent neck pain with radiation of pain into the head and both arms, with the pain being greater on the left than the right. The doctor found this to be a change in the claimant's condition, as previously the pain had been primarily on the right side. The doctor noted that the claimant had localizing areas of numbness in the left arm, and that he had milder symptoms in his back and knees. Therefore, the doctor concentrated on the claimant's most severe complaints of neck and radicular pain resulting from his neck. The doctor scheduled an MRI for the claimant. The MRI, performed on February 23, 1988, indicated there was a

degenerated disc at C4-5, C5-6 and C6-7 levels; there were small osteophyte formations at the C5-6 and C6-7 levels; and there was a bulging disc at the C5-6 level but no solid evidence of herniation.

At the claimant's visit of March 1, 1988, the claimant continued to complain of neck and knee symptoms. At this time, the doctor ordered a dye-injected CAT scan for the claimant. The CAT scan of the claimant's left knee showed a tear of the medial meniscus, and the CAT scan of the neck revealed large spurs at C5-6 level, as well as a bulging disc with uncertain evidence of herniation at the C3-4 level. Because the doctor believed the claimant's condition was worse than the radiologist reported, the doctor talked to the radiologist, following which he made a handwritten notation on the report that there was possible nerve encroachment. The doctor thought that the claimant had nerve entrapment at the C5-6 level because of a herniated cervical invertebral disc. The doctor explained that the symptoms of a herniated cervical disc would be local and radicular pain in the areas where the sixth cervical nerve extended. It was the doctor's opinion that the nerve encroachment revealed on the CAT scan was the cause of the claimant's radicular complaints the claimant had had regarding his right arm prior to the accident of January 5, 1988.

The doctor admitted that the claimant had a preexisting condition of degenerative-disc disease, which contributed to his problem; however, the claimant was asymptomatic prior to April 8, 1987, from which the doctor concluded that the accident in April 1987 was a contributing factor to the claimant's condition. The doctor stated that while the claimant's preexisting condition made him more susceptible to injury, the injury the claimant suffered on April 8, 1987, was sufficient to aggravate his preexisting condition. It was the doctor's opinion that the claimant's accident of April 8, 1987, was a major contributing factor to his disc herniation and the nerve-root impingement. The doctor admitted that while the claimant's MRI and CAT scan revealing the herniated disc were done after the accident of January 5, 1988, he had suspected a herniated disc in May 1987 based upon the evidence of the bulging disc revealed on the plain X rays and from the claimant's radiculitis before the second accident. The MRI and the dye-injected CAT scan provided more complete evidence of the herniation of the cervical disc. The doctor admitted that he had not advised the claimant to discontinue working after his first accident, but he stated that if the claimant had reported to him that he was unable to work because of the severity of the pain, he would have restricted the claimant from working. The

doctor was of the opinion that the claimant was unable to work after the second accident of January 5, 1988.

The doctor also related the claimant's left-knee injury to his accident of April 8, 1987. The doctor explained that his reference to the claimant's "old ostochondritis dissecans" in his letter of May 29, 1987, referred to the kneecap, but that the narrowing of the medial compartment, the injury incurred in the claimant's first accident, referred to the knee joint itself. According to the doctor, the degenerative changes in the claimant's knee weakened the meniscus, but that it took an additional external application of force to cause the tear.

The doctor believed that the claimant's accident of January 5, 1988, could have caused the claimant's low-back injury, as the claimant had not complained of low-back pain prior to this second accident. When asked if the claimant's low-back injury was responsible for the claimant's inability to return to work, the doctor responded that he had insufficient knowledge of the claimant's low back to answer the question, as he had only X-rayed the claimant's lower back at his last visit.

In Dr. James Duffy's deposition taken on April 27, 1990, he testified that he is a neurological surgeon. Dr. Duffy stated that he saw the claimant on two occasions at the request of the claimant's attorney. At these visits, the doctor examined the claimant but he did not treat him. The claimant's first visit to Dr. Duffy was on July 11, 1988. The history given to the doctor by the claimant conformed to the history given to Dr. Greenwald, *i.e.*, that he had an accident in April 1987 and a second accident in January 1988. Dr. Duffy knew that the claimant's first accident involved him falling through a conveyor and being struck across the head, neck and shoulder with a piece of lumber. Dr. Duffy described the claimant's second accident as an episode wherein the claimant was carrying a bag of sand and slipped and fell.

When the doctor examined the claimant, the claimant complained of severe neck pain, bilateral shoulder pain, low-back pain, left-knee pain and had mild complaints of pain to the right shoulder and the right ankle. The claimant also complained of numbness and cramping in both hands, which occurred intermittently.

Dr. Duffy reviewed the reports from the claimant's CAT scan and the MRI. These reports revealed that the claimant had marked arthritic involvement of the lumbar as well as the cervical area, and that there was osteophyte formation at the C3-4, C4-5 and the C5-6 level with disc involvement at the C4-5 and C5-6 level. The doctor

was aware that the claimant also had degenerative changes and a tear in the medial meniscus of the knee.

The doctor's neurological examination showed that the claimant had hypesthesia (decreased sensation) over the entire body below the clavicle on both sides; that he had no muscle weakness; that all movement of the lumbar spine was restricted by pain; and that there was moderate paraspinal muscle spasm both in the neck and the lumbar region. It was the doctor's conclusion that the claimant had a tear in the cartilage of the left knee, and that he had severe arthritic changes aggravated by injury in the cervical region with a possible disc protrusion in the neck. The doctor thought the disc protrusion was probably at the C5-6 level. It was the doctor's understanding that the claimant's first accident of April 8, 1987, injured the claimant's neck, his left knee and possibly his right ankle, while the claimant's second accident in January 1988 injured primarily the claimant's lower back.

Dr. Duffy saw the claimant for the second time on April 9, 1990. At this time, the claimant's complaints were generally the same as at his first visit, i.e., he had low-back pain and considerable pain in the neck. Dr. Duffy was aware that the claimant recently had neck surgery, that he had knee surgery, and that he recently had an MRI on his lower back, but the doctor had not seen the results of the MRI. From the doctor's examination, the doctor found the claimant had vague areas of decreased sensation over his entire body, and in particular, he had an oval area of anesthesia over the left thigh, a condition which is referred to as meralgia paresthetica (an abnormal condition marked by tingling, burning, and stabbing pains in the outer side of the lower part of the thigh).

It was Dr. Duffy's opinion that the claimant was totally disabled from performing any construction work, and that the claimant was unable at this time to perform light-duty work. The doctor thought that the claimant may require surgery on his lower back. When asked if the doctor had an opinion on whether the claimant was able to work given his neck injury, the doctor responded that "[r]elative to the neck alone, no, he would not be able to work at the present time." The doctor also thought the claimant could not work due to his lower-back injury. The doctor gave as his opinion that the claimant's neck injury was a result of his accident of April 1987, and that the accident of January 1988 may have aggravated the injury but it did not cause it. The doctor explained that, in his opinion, the claimant would have required neck surgery even if the second accident had not occurred.

Dr. Duffy agreed with Dr. Greenwald that, although the MRI and CAT scan revealing the claimant's herniated disc in his neck were performed after the second accident, there was objective evidence of herniation before the accident of January 1988. Dr. Duffy explained that Dr. Greenwald's notes of August 1987 implied that there was pain in the cervical spine and in the right shoulder before August. Dr. Duffy also noted that Dr. Greenwald reported the claimant had complaints of neck pain in May and June 1987. Dr. Duffy found that Dr. Adelmann's notes indicated that the claimant had radicular symptoms in May 1987 when he sneezed or coughed or made sudden motions, and Dr. Duffy explained that these are the type of symptoms he expects to find in a case of a herniation at the C5-6 level. Dr. Duffy also explained that persons with herniated cervical discs could perform physical labor for long periods of time with this condition. Dr. Duffy stated that he would return a person with a herniation to work as long as he had no pain. Dr. Duffy did not find it unusual for the claimant to have an increase in pain after his second accident where there is a preexisting herniation.

Dr. Adelmann's notes indicated that he saw the claimant on May 1, 1987, at which time the claimant complained of numerous problems which had developed as a result of a work accident three weeks ago. Dr. Adelmann had X rays taken of the claimant's cervical spine. From the X rays and his examination of the claimant, the doctor determined that the claimant had rather severe arthritis with foraminal narrowing and interspace narrowing at multiple levels bilaterally, that the claimant had considerable limitation of range of motion in his neck, and that no radicular symptoms were produced with compression testing, but that he did have radicular symptoms with sneezing, coughing or making sudden motions. Additionally, the doctor found that the claimant might have sustained a strain of his left knee, but that he may also have a medial-meniscal degenerative-type tear underlying the strain.

Dr. Greenwald's notes of the claimant's visits in 1987 and 1988 and Dr. Duffy's written reports of his two examinations of the claimant were also admitted into evidence. These notes basically corroborated their testimony presented in their evidence depositions.

The hospital records from St. Joseph's Hospital established that the claimant underwent a bilateral femoral herniorrhaphy on January 15, 1988, for his hernias incurred in the accident of January 5, 1988. These records indicated that this surgery was performed by Dr. Rubino.

Dr. Steven J. Mash's letter of April 19, 1988, to Hartford Insurance was admitted over the objection of Newberg, with the proviso that it was admitted only as an admission against interest against Midway. In Dr. Mash's letter, the doctor indicated that he saw the claimant at the request of Midway on April 15, 1988. Dr. Mash stated in his letter that the claimant has orthopedic complaints which the claimant related to an accident of April 8, 1987. Dr. Mash reiterated the facts regarding the accident of April 8, 1987, and these facts correlated with other histories of the accident. The doctor stated in his letter that the claimant incurred injuries to his left knee and to his neck from this accident. Dr. Mash also set forth the facts concerning the claimant's accident of January 5, 1988, and he stated that the claimant's low-back difficulties were related to this accident.

Dr. Mash reviewed the claimant's arthrogram of his left knee, the CAT scan of the left knee, the X rays of his neck, the CAT scan of the neck and the MRI of the claimant's neck. The doctor noted that the CAT scan of the left knee indicated there was a tear of the medial meniscus posteriorly. The CAT scan of the claimant's neck revealed degenerative changes throughout the neck, while the MRI revealed degenerative narrowing at C4-5, C5-6 and C6-7 with osteophytic formation and a bulging disc at C5-6.

The doctor reported that the claimant complained of pain to his left knee and his back. The doctor found his examination of the claimant's cervical spine to be normal, but he noted that in his examination of the claimant's low back the claimant walked with a wide-based, drop-foot gait on the left. The X rays the doctor took of the claimant's low back were unremarkable. The doctor gave his clinical diagnosis of the claimant's condition as a probable tear of the medial meniscus of the left knee, degenerative cervical arthralgia, and he had written down "[r]ule out herniated disc, lumbar spine." The doctor found that the claimant had objective findings to support his subjective complaints. Dr. Mash gave as his opinion that most of the claimant's difficulties were related to his injury of April 1987 and were only temporarily aggravated by his injury of January 1988.

The records of Northwestern Medical Faculty Foundation containing Dr. Gordon Nuber's orthopedic notes were admitted into evidence. These notes established that Dr. Nuber first saw the claimant on May 17, 1988. At that time, the claimant complained of pains "over his whole body," but that the claimant was seeing him because of left knee, right ankle, neck and back pain. Dr. Nuber noted the claimant's two accidents, the one in April 1987 and the second acci-

dent in January 1988. His examination of the claimant's knee revealed no effusion, that the knee was quite stable anteroposteriorly and mediolaterally, that Steinman was positive along the medial joint line, that the knee had full range of motion, and that there was mild crepitation present in the knee. Dr. Nuber indicated in his notes that he was going to refer the claimant to Dr. Butler, as the claimant had a history of a herniated disc in his neck and he did not want to treat that. Dr. Nuber's impression of the claimant's left-knee condition was that the claimant had a torn cartilage, but he recommended an arthrogram to confirm this. Subsequent notes of the doctor revealed that the claimant had two arthrograms performed, and that these tests revealed he had a tear in the cartilage of his left knee, for which the doctor recommended arthroscopy. Dr. Nuber performed an arthroscopy on the claimant's left knee on or about August 20, 1988, and he saw the claimant for follow-up visits on August 30, 1988; September 23, 1988; November 1, 1988; and February 16, 1989.

Lastly, a letter from Dr. Albert Butler to Dr. Nuber dated May 31, 1988, and the doctor's discharge summary and report of operation from Northwestern Memorial Hospital following the claimant's cervical surgery were admitted into evidence. In Dr. Butler's letter of May 31, 1988, he indicated that he saw the claimant on May 30, 1988, at which time the claimant complained of neck and bilateral episodic arm pain. Dr. Butler stated that the claimant indicated his symptoms arose as a result of a fall at work in January 1988, but that he later indicated that he had suffered neck pain as much as five years ago. The doctor's examination of the claimant showed some mild weakness of the biceps on the right, a questionable weakness of triceps function on the left, and some "patchy but identifiable hypalgesia in both the right and left C5-6 distribution."

Dr. Butler reviewed the claimant's myelogram, CAT scan and MRI, all of which indicated an abnormality at the C5-6 level. Dr. Butler indicated that he did not feel this problem was acute but was a long-standing problem which was exacerbated by his injury at work. He recommended conservative treatment "until such time as he noted increasing significant pain, increasing weakness of the right and/or left arm and any difficulties of gait, possibly suggesting spinal cord compression."

In Dr. Butler's discharge summary from Northwestern Memorial Hospital dated June 24, 1989, he stated the claimant's condition arose from an injury to the cervical spine in an accident at work in April 1987. The doctor reported that the claimant noticed subsequent numbness in his hands which became progressively worse; pain in his

arms, hands, back and hips; and, most recently, decreased strength in his arms bilaterally. On June 19, 1989, the claimant underwent an anterior cervical diskectomy at C5-6 with an osteophytectomy with an iliac crest bone graft. At the time of the claimant's discharge from the surgery, the numbness and tingling in the claimant's fingers were gone and the pain in his legs was similarly reduced. The doctor's discharge diagnosis was a herniated cervical disc at the C5-6 level.

Dr. Butler's report of the operation on the claimant's neck indicated that conservative treatment had failed to help the claimant's condition. Dr. Butler reported that the claimant's radiologic findings were consistent with his physical complaints, and that the claimant's right-upper-extremity pain in distribution was consistent with a C6 radiculopathy.

From the foregoing evidence, the arbitrator found that the claimant's current condition of ill-being regarding the claimant's left knee and cervical spine was causally connected to his work accident of April 8, 1987. The arbitrator further found that, although a recent MRI of the lumbar spine indicated the claimant has a herniated disc in that area, no evidence was presented to show that the lumbar-spine injury and the hernias were preventing the claimant from working, but that the evidence of the claimant's knee arthroscopy and the cervical herniation surgery had shown that these injuries had rendered the claimant incapable of working. The arbitrator held that the claimant was entitled to 109³/₇ weeks of TTD commencing from April 16, 1988 (which the arbitrator indicated in his decision was the date the claimant's disability from the hernia surgery ended), and that he was entitled to medical expenses totalling $31,793.50. As was noted previously, the Commission modified the arbitrator's decision by reducing the claimant's TTD to 103³/₇ weeks but otherwise affirmed the arbitrator's determination. The Commission's decision was confirmed by the circuit court on review.

On appeal, Newberg contends that the Commission's determination that the claimant's current condition of ill-being regarding his cervical spine and his knee injury was causally connected to his initial work-related accident of April 8, 1987, was against the manifest weight of the evidence. Newberg's argument of this issue is twofold: (1) that the evidence revealed that the intervening accident of January 5, 1988, was a major contributing cause to the claimant's condition of ill-being, and, thus, Midway should be held to be responsible for the TTD and the medical expenses incurred after the second intervening accident, and (2) that the Commission concluded incor-

rectly there was no medical evidence presented that the lumbar-disc herniation incurred in the claimant's subsequent accident was preventing the claimant from returning to work.

With regard to the respondent's first contention that the intervening accident was a major contributing cause of claimant's cervical-spine injury and his left-knee injury, the respondent argues its position is supported by the fact that the claimant continued to work after the first accident of April 8, 1987, that the claimant failed to seek medical treatment for his injuries until two or three weeks after the accident, that Dr. Greenwald never restricted the claimant's work duties until after the second accident, and that the intervening accident worsened and accelerated his preexisting condition and generated new injuries which prevented the claimant from working. We disagree.

■ It is well established that it is the Commission's function to determine the credibility of witnesses and to determine causal connection, and that the Commission's determination of these issues will not be overturned upon review unless the Commission's decision is against the manifest weight of the evidence. (*Material Service Corp. v. Industrial Comm'n* (1983), 97 Ill. 2d 382, 454 N.E.2d 655; *Dean v. Industrial Comm'n* (1986), 143 Ill. App. 3d 339, 493 N.E.2d 16.) Where a work accident aggravates or accelerates a preexisting condition, the preexisting condition will not prevent an employee from receiving benefits if it is shown that the work-related accident is a factor which contributed to the disability. (*Material Service Corp. v. Industrial Comm'n*, 97 Ill. 2d 382, 454 N.E.2d 655.) Moreover, an award of TTD is justified even if an employee's incapacity does not immediately follow an accidental injury, if it is shown that the incapacity is directly traceable to and the result of the injury. (*Christman v. Industrial Comm'n* (1989), 180 Ill. App. 3d 876, 536 N.E.2d 773.) Furthermore, an employee will not be denied compensation because he continued to work for as long as he could after the injury. (*Christman v. Industrial Comm'n* (1989), 180 Ill. App. 3d 876, 536 N.E.2d 773.) In addition, just as a nonwork-related accident does not prevent a claimant from receiving TTD, neither does an intervening work-related accident cut off the claimant's right to receive TTD for the first work-related injury. *Christman v. Industrial Comm'n* (1989), 180 Ill. App. 3d 876, 536 N.E.2d 773.

■ Here, the evidence in the record established that, while the claimant continued to work after his accident of April 8, 1987, he was helped in his work duties by his "partners" and did not lift heavy items, and that he continued to work because he "had to

make a living." The claimant also testified that his work at Midway did not involve heavy lifting, and except for the day of his subsequent accident when he carried the bag of sand, he mainly corrected painting errors and washed walls with thinner. Furthermore, it was the claimant's testimony that his pain from the injuries he received in the initial work-related accident became progressively worse as time passed. Dr. Greenwald testified that, although he did not restrict the claimant's work duties after the accident of April 8, 1987, he would have if the claimant had reported to him that he was unable to work because of the severity of his pain. Similarly, Dr. Duffy testified that a person with a herniated cervical disc could perform physical labor for long periods of time with this condition, and that he would allow a person with this injury to work as long as he had no pain.

Additionally, we do not consider the fact that the claimant did not seek immediate medical treatment a detriment to his collecting TTD. After his condition became worse, the claimant did seek treatment within two to three weeks of his injury.

Further, the medical testimony presented at the arbitration hearing established that the claimant's herniated cervical disc and his left-knee injury were traceable to his work-related accident of April 8, 1987. The testimony of Dr. Greenwald, the claimant's treating physician in 1987 and 1988, revealed that although the claimant had a preexisting condition of degenerative-disc disease which contributed to his problem, and that the claimant had an "old ostochondritis dissecans" in his left knee, nevertheless, the claimant's herniated cervical disc and his left-knee injury were caused by the work-related accident of April 8, 1987. Additionally, the doctor had suspected the claimant had a herniated disc at the C5-6 level as early as May or June of 1987, before the subsequent accident occurred. The doctor also testified that the claimant's radicular symptoms in 1987 and the bulging disc revealed in the early plain X rays taken of the claimant's cervical spine presented objective evidence of herniation of the cervical disc, and that the more comprehensive diagnostic tests, i.e., the MRI and the CT scan, which were not performed until after the second accident of January 5, 1988, served only to provide more complete evidence of the claimant's condition.

Additionally, Dr. Duffy's testimony established that it was his opinion that the claimant's neck and knee injuries were related to the initial accident of April 8, 1987. He, too, testified that the claimant's radicular symptoms were noted as early as May 1987 and provided objective evidence of the claimant's herniated cervical disc, and

thus, the herniated disc was present before the subsequent accident occurred. He also found that the claimant had severe arthritic changes in his cervical spine, but he determined this condition was aggravated by the injury to the neck in the accident of April 8, 1987. Both Dr. Duffy and Dr. Greenwald attributed the claimant's lower-back injury and his development of hernias to his subsequent accident of January 5, 1988.

Dr. Butler's discharge summary of the claimant following the claimant's surgery on his herniated cervical disc indicated that the claimant's herniated cervical disc resulted from the accident of April 8, 1987. From the foregoing evidence, the Commission's determination that the claimant's cervical injury and left-knee injury were causally connected to the accident of April 8, 1987, was not against the manifest weight of the evidence.

■ We next consider Newberg's contention that the Commission incorrectly failed to consider that the claimant's lumbar injury resulting from his subsequent accident was the major contributing factor in the claimant's inability to work. Without refining on this unduly, a review of the record reveals that Dr. Greenwald testified that he had insufficient knowledge of the claimant's lumbar-spine injury to determine if that injury prevented the claimant from returning to work. Dr. Duffy testified that the claimant's cervical-spine injury was a major factor in the claimant's inability to work. Dr. Duffy also testified that the claimant's lumbar-spine injury would prevent him from working. Thus, it is reasonable to infer that each of these injuries was sufficient in itself to prevent the claimant from returning to work. The majority of the evidence presented at the arbitration hearing concerned the claimant's diagnosis and treatment of his left-knee injury and his herniated cervical disc. There was also a brief statement in the record that the claimant has a herniated lumbar disc, but very little other evidence was presented as to what the projected prognosis and treatment of this condition was to be.

Newberg argues that it should not have to undertake the entire financial burden for the claimant since he was only unable to work after the subsequent accident in January 1988. However, Newberg is not assuming the total financial burden for the claimant's disability but is paying benefits for the claimant's injuries resulting from the accident in April 1987 only, as the record reveals that the arbitrator held that the claimant was entitled to TTD from Midway for his hernias until April 16, 1988, at which time the disability from the hernias ended. Subsequent to the hernia operation, the claimant was still unable to work, and Dr. Nuber began his care and treatment of

the claimant's left-knee injury shortly thereafter. Dr. Nuber operated on the claimant's left knee in August 1988. Also, Dr. Butler began his care of the claimant for his herniated cervical disc in May 1988, and he performed the surgery on the claimant's neck in June 1989. Since the claimant's left-knee injury and his neck injury were incurred in his first accident while employed with Newberg, the Commission's determination that Newberg was responsible for the claimant's TTD during the time of treatment for these two injuries was not against the manifest weight of the evidence.

The last issue raised by Newberg is that the Commission relied on improper evidence in its determination of causal connection. Newberg argues that the Commission relied on Dr. Mash's report wherein the doctor stated irrefutably that the claimant's cervical injury and left-knee injury were causally connected to his accident of April 8, 1987. Newberg asserts that this was reversible error as this document was not admitted into evidence in connection with the claimant's claim against it, but was only admitted on the premise that it was an admission against interest against the respondent Midway. This argument is without merit.

■ While the Commission did refer to Dr. Mash's report and his conclusions regarding causal connection of the claimant's neck and knee injuries, the Commission also referred in its decision to Dr. Greenwald's and Dr. Duffy's conclusions that the claimant's injuries were causally connected to the first accident. Thus, although the Commission discussed Dr. Mash's report in conjunction with the claimant's claim against Newberg, the Commission's decision was supported by the other testimony in the record on causal connection, and there was no prejudice to Newberg. We find that, if the admission of Dr. Mash's report was arguably error, the discussion of the report by the Commission was harmless error, since Dr. Mash's report did not materially affect the outcome of this case but was simply cumulative of other evidence. *Illinois Piping Co. v. Industrial Comm'n* (1987), 156 Ill. App. 3d 955, 509 N.E.2d 1107.

For the foregoing reasons, the judgment of the circuit court of Will County confirming the decision of the Industrial Commission is affirmed.

Affirmed.

McCULLOUGH, P.J., and WOODWARD, STOUDER, and RAKOWSKI, JJ., concur.