PEABODY COAL COMPANY, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Francis Miskle *et al.*, Appellees).

Fifth District (Industrial Commission Division)   No. 5—03—0678WC

Opinion filed June 16, 2004.

Kevin M. Hazlett, of Kevin M. Hazlett, P.C., of Swansea, for appellant.

Harold B. Culley, Jr., of Culley & Wissore, of Raleigh, for appellees.

JUSTICE GOLDENHERSH delivered the opinion of the court:
On December 8, 1997, the claimant, Francis Miskle, filed an ap-

plication for adjustment of claim pursuant to the Workers' Occupational Diseases Act (Act) (820 ILCS 310/1 *et seq.* (West 1996)). The claimant alleged he was disabled as the result of an occupational disease that arose out of his employment with Peabody Coal Company (the employer). Following a hearing, the arbitrator found that the claimant suffered from work-related, chronic obstructive pulmonary disease and chronic bronchitis, which were either caused in part or aggravated by his exposure to coal mine dust while working for the employer. The arbitrator awarded the claimant 15% permanent partial disability of the body as a whole (820 ILCS 310/7 (West 1996); 820 ILCS 305/8(d) (West 1996)). Each party filed a petition for the review of the arbitrator's decision. The Illinois Industrial Commission (Commission) modified the decision of the arbitrator by finding the claimant permanently disabled to the extent of 25% of the body as a whole. The employer appealed. The circuit court confirmed the Commission's decision. The employer raises three issues on appeal: (1) whether the Commission's decision is against the manifest weight of the evidence, (2) whether the claimant proved he was disabled within two years of the date of his last exposure, as defined in sections 1(e) and 1(f) of the Act (820 ILCS 310/1(e), (f) (West 1996)), and (3) whether the claimant is entitled to an award of 25% loss of the use of the body as a whole. We affirm.

## FACTS

After working for 22 years for the employer, the claimant retired on July 29, 1997, his sixty-third birthday. At the arbitration hearing, the claimant was 66 years old. The claimant explained that he did not want to retire. He described why he decided to retire: "[M]y health was getting bad and I got old enough to draw Social Security[,] and I got scared of my job, afraid I'd get hurt. *** I couldn't breathe[,] and I couldn't get enough air through a respirator." The claimant was going to try to work for another year and a half until a new contract was signed, because that would have increased his pension, but he decided not to wait for the new contract due to his health and safety concerns. The claimant said that about three weeks before he retired, he got knocked down by a rock and that this, too, made him think it might be time to retire. He later reiterated that his main concern was his inability to breathe and wear a dust mask.

The claimant testified that he underwent two angioplasties, the most recent one having been performed in 1993. He denied that his heart condition had any effect on his decision to retire, stating he actually felt better after those procedures had been performed. The claimant underwent treatment for colon cancer in 1990, but he has since recovered.

The claimant has not sought other employment since his retirement because he does not believe he is healthy enough to hold a job. The claimant has a sixth-grade education. He left school to help on the family farm after his father was injured. The claimant worked for a variety of employers before starting his job with the employer. The claimant testified that he was exposed daily to rock, sand, and coal dust during the 22 years he spent working for the employer.

The claimant first noticed breathing problems in 1990. He testified that his breathing problems got progressively worse and affected his daily activities. For example, the claimant used to swim and walk, but he no longer participates in those activities. He can only walk about 60 to 100 yards at a time and climb one set of stairs. The claimant stated that he still maintains a garden but that he has to do a little bit each day rather than all the work at once. The claimant started smoking when he was 20 years old and smoked a pack a day until late winter 1996 or early 1997. He now only smokes "once in a great while."

On cross-examination, the claimant admitted he has not seen a doctor specifically to treat his breathing problems. He did, however, testify that he had a daily cough with sputum production for several years before he retired. The claimant explained that even though he started having breathing problems in 1990, he was diagnosed with colon cancer around the same time and, therefore, was more concerned about the cancer than his breathing problems. The claimant testified that he mentioned his breathing problems to his primary care physician, Dr. Coulter. The claimant took a normal retirement and did not apply for disability.

On October 13, 1997, the claimant was examined by Dr. William Houser, a pulmonary specialist, upon a referral by the claimant's attorney. Dr. Houser is the medical director at the Black Lung Clinic at Deaconess Hospital in Evansville, Indiana. Dr. Houser has performed between 2,000 and 3,000 black lung examinations on referrals from the United States Department of Labor or other physicians. Dr. Houser noted that the claimant had a seven- to eight-year history of respiratory symptoms, including a daily cough with sputum production, exertional dyspnea, and shortness of breath while walking or climbing stairs. Pulmonary function tests showed a mild airway obstruction and a mild reduction in the MVV (maximum voluntary ventilation). Dr. Houser categorized the claimant's chest X ray as 0/1, which means that while there were some abnormalities consistent with coal workers' pneumoconiosis, there were not enough opacities to give a positive reading.

Dr. Houser opined that the claimant suffers from chronic obstruc-

tive pulmonary disease and chronic bronchitis secondary to smoking and coal and rock dust exposure. Dr. Houser explained that coal miners can develop chronic obstructive pulmonary disease or chronic bronchitis from mining alone and that most smokers do not get either of the diseases. For example, the reported incidence of chronic obstructive pulmonary disease in smokers is in the 15% to 18% range, while the highest incidence of chronic bronchitis in smokers is 30%. According to Dr. Houser, coal mining is a well-documented cause of chronic bronchitis. Dr. Houser concluded that the claimant suffers from a permanent impairment of function due to his airway obstruction, which makes him unable to perform heavy manual labor and leaves him disabled from mining, because any additional dust exposure would aggravate the claimant's condition.

On February 22, 2000, Dr. Tuteur, a pulmonologist, examined the claimant at the employer's request. Pulmonary function studies showed a mild obstructive ventilatory defect that improved following the administration of an aerosolized bronchodilator. He noted a mild increase in residual volume suggesting air trapping. He saw no abnormality on the chest X ray or CT scan. Dr. Tuteur concluded that the claimant did not suffer from coal workers' pneumoconiosis or any other disease induced by coal mine dust. He opined that the claimant suffered from mild chronic obstructive pulmonary disease caused by smoking a pack of cigarettes per day for 42 years.

Dr. Tuteur explained that the claimant's condition is rarely caused by chronic inhalation of coal mine dust. He specifically stated, "The frequency with which cigarette smoke does this, compared to coal mine dust producing the same phenomenon, is 15 to 50 times greater." On cross-examination, Dr. Tuteur agreed that coal mine dust can produce airflow obstruction, and he agreed that coal mine dust cannot be completely ruled out as a contributing cause. Dr. Tuteur agreed that the best advice for someone with chronic obstructive pulmonary disease is to stay away from agents which can cause or aggravate the disease.

The claimant's medical records from his primary care physician, Dr. Coulter, were introduced into evidence by the employer. The records cover the claimant's treatment from December 1987 through 1997. During that time, the claimant made complaints of productive coughs and chest congestion and was treated for bronchitis. For example, an entry from Sparta Community Hospital dated October 29, 1990, states, "[The claimant] has a morning cough productive of some black sputum from the coal mine." A January 28, 1991, discharge summary after the claimant's surgery for colon cancer reported that pulmonary function testing showed a mild obstructive lung disease

and that the claimant required oxygen therapy due to mild hypoxemia postsurgery. However, chest X rays taken between December 1987 and 1997 were normal.

After hearing all the evidence, the arbitrator found that the claimant had a pulmonary condition causally related to his employment with the employer, and the arbitrator awarded 15% of the body as a whole. The Commission modified the award to 25% of the body as a whole. The circuit court confirmed. The employer now appeals.

## ANALYSIS

The first issue set forth by the employer is whether the Commission's decision that the claimant has an occupational disease and is disabled as a result of that disease is against the manifest weight of the evidence. The employer contends that the evidence indicates that the claimant took a normal retirement and was not disabled in any manner. The employer also asserts that the claimant's primary care physician's records contradict the claimant's testimony that the claimant suffered from breathing problems for several years. We disagree.

It is the function of the Commission to resolve disputed questions of fact, including the issue of causal connection. The Commission is also to decide which of the conflicting medical views should be accepted, judge the credibility of the witnesses, and draw permissible inferences from the evidence. *Dexheimer v. Industrial Comm'n*, 202 Ill. App. 3d 437, 442, 559 N.E.2d 1034, 1037 (1990). The Commission's decision should only be set aside if it is against the manifest weight of the evidence. *Gust K. Newberg Construction v. Industrial Comm'n*, 230 Ill. App. 3d 96, 111, 594 N.E.2d 758, 768 (1992). For a finding to be contrary to the manifest weight of the evidence, an opposite conclusion must be clearly apparent. *Dolce v. Industrial Comm'n*, 286 Ill. App. 3d 117, 120, 675 N.E.2d 175, 178 (1996).

■ In the instant case, the Commission affirmed and adopted the decision of the arbitrator regarding all the issues, except the extent of permanency. With regard to causal connection, the arbitrator specifically found that the claimant suffered from chronic obstructive pulmonary disease and chronic bronchitis, caused in part or aggravated by his exposure to coal mine dust while working for the employer. This finding was based in large part upon the testimony of Dr. Houser, the medical director at the Black Lung Clinic at Deaconess Hospital in Evansville, Indiana. Dr. Houser opined that the claimant's condition was related to the claimant's exposure to coal and rock dust and to smoking. Dr. Houser's opinion was contrary to the opinion of the expert retained by the employer, Dr. Tuteur, who opined that the claimant's condition was caused only by his 42 years of smoking and not his exposure to coal and rock dust.

While the employer would have liked the Commission to give greater weight to its expert's testimony, the reality is that the Commission determined that of the two experts' conflicting medical opinions, it found Dr. Houser's to be more credible. Moreover, contrary to the employer's assertion that the claimant's primary care physician's records are damning to the claimant's theory, Dr. Coulter's records actually support the claimant's theory. For example, Dr. Coulter specifically noted during the claimant's 1990 hospitalization for colon cancer that the claimant "has a morning cough productive of some black sputum from the coal mine." The records show a long history of breathing problems with numerous cases of bronchitis prior to the claimant's retirement.

As to the fact that the claimant took a normal retirement on his sixty-third birthday, it is well accepted that "voluntary retirement does not preclude an award of benefits under the Act." *Freeman United Coal Mining Co. v. Industrial Comm'n*, 263 Ill. App. 3d 478, 485-86, 636 N.E.2d 77, 82 (1994). Even though the claimant's retirement was voluntary in one sense, the claimant testified that the main reason he quit working was that he could not breathe and could not get enough air through a respirator while he was working in the mine. Finally, both medical experts, including the employer's expert, concurred that someone with the claimant's condition should stay away from agents that can cause or aggravate the condition. By all accounts, coal dust would aggravate the claimant's condition. Accordingly, after carefully reviewing the record before us, we cannot say that the Commission's decision is against the manifest weight of the evidence.

■ The second issue raised by the employer is whether the claimant proved he was disabled within two years after the last day of the last exposure to the hazards of the occupational disease, as required by sections 1(e) and 1(f) of the Act (820 ILCS 310/1(e), (f) (West 1996)). Whether a claimant has provided sufficient evidence of disablement is a question of fact for the Commission, and its decision in this regard will not be reversed unless it is against the manifest weight of the evidence. *Freeman United Coal Mining Co.*, 263 Ill. App. 3d at 486, 636 N.E.2d at 82. Here, the claimant's last day of exposure was the last day of his employment, July 29, 1997. The claimant testified that one of the main reasons he quit working was that he was having trouble breathing. Dr. Houser examined the claimant on October 13, 1997, and concluded that the claimant suffered from chronic obstructive pulmonary disease and chronic bronchitis caused in part by exposure to coal and rock dust. He concluded that the claimant is disabled from mining. Thus, we find that the evidence supports the

Commission's conclusion that the claimant's disablement occurred within the statutory two-year period.

■ The final issue raised by the employer is whether the Commission's finding that the claimant is permanently partially disabled to the extent of 25% is against the manifest weight of the evidence. The employer contends that the award of 25% of the body as a whole is unreasonable under the facts of this case. The employer points to the mild nature of the claimant's disease and the fact that Dr. Tuteur concluded that his problems were not related to coal mining but to his pack-a-day habit of cigarette smoking over the course of 42 years.

A determination of the extent of a claimant's disability is a question of fact to be determined by the Commission, whose decision will not be set aside unless it is against the manifest weight of the evidence. *Freeman United Coal Mining Co.*, 263 Ill. App. 3d at 485, 636 N.E.2d at 82. As previously set forth, when conflicting medical evidence is presented, it is for the Commission to determine which testimony will be accepted. Here, the claimant testified that he started noticing breathing problems as early as 1990 and that his problems have worsened over time and interfere with his enjoyment of normal activities, such as walking and swimming. The claimant testified that as a result of his breathing problems, he can only walk between 60 and 100 yards, climb one flight of stairs, and perform gardening tasks in intervals rather than all at once. Medical charts introduced into evidence by the employer confirm that as early as 1990, the claimant was producing black sputum from his exposure in the coal mine. Under these circumstances, the Commission's award of 25% cannot be said to be against the manifest weight of the evidence.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Randolph County is affirmed. The Commission's decision cannot be said to be against the manifest weight of the evidence.

Affirmed.

McCULLOUGH, P.J., and HOFFMAN, CALLUM, and HOLDRIDGE, JJ., concur.