ARLENE BERNARDONI, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Huntsman Chemical Company, Appellee).

Third District (Illinois Workers' Compensation Commission Division)
No. 3—05—0226WC

Opinion filed December 6, 2005.—Rehearing denied January 9, 2006.

Peter F. Ferracuti and Jason M. Whiteside, both of Law Offices of Peter F. Ferracuti, P.C., of Ottawa, for appellant.

Kevin J. Luther and Brad A. Antonacci, both of Heyl, Royster, Voelker & Allen, of Rockford, and Brad A. Elward and Karen L. Kendall, both of Heyl, Royster, Voelker & Allen, of Peoria, for appellee.

JUSTICE CALLUM delivered the opinion of the court:

## I. INTRODUCTION

Alleging that she developed respiratory illness and chemical sensitivity while working for employer, Huntsman Chemical Company, claimant, Arlene Bernardoni, filed an application for adjustment of claim under the Workers' Occupational Diseases Act (Act) (820 ILCS 310/1 et seq. (West 1994)). An arbitrator awarded claimant $13,309 in medical expenses and found that she was permanently and totally

disabled. The Industrial Commission[1] (Commission) disagreed with the arbitrator and found instead that claimant's smoking caused her condition, which was temporarily aggravated by a work-related exposure to a cleaning agent. It awarded claimant 12³/₇ weeks of temporary total disability (TTD) benefits and $1,010.57 in medical expenses. In ruling, the Commission refused to consider claimant's expert evidence on multiple chemical sensitivity (MCS). On judicial review, the trial court confirmed the Commission's decision.

On appeal, claimant argues that (1) the Commission erred in finding that the testimony of her treating physician about MCS was inadmissible because the diagnosis of MCS is not sufficiently established to have obtained general acceptance in the medical community; and (2) the Commission's decision that claimant's condition of ill-being was caused by her smoking and not her exposure to chemicals while working in employer's plant is against the manifest weight of the evidence. We affirm.

## II. BACKGROUND

Filed in 1995, the original application for adjustment of claim alleged that, on February 22, 1994, "[w]hile cleaning carpet, [claimant] was exposed to chemicals resulting in injury to whole body." In 1998, claimant amended the application to allege that she was "also exposed to other chemicals during the 14 years of employment by" employer.[2] As a result of the exposures, claimant developed chemical sensitivity.

The arbitration hearing took place on April 17, 2002, and May 23, 2002. Claimant testified that she began smoking cigarettes in 1964, at age 21. She smoked approximately one pack per day until she stopped smoking regularly in October 1994. Twice, she resumed smoking for short periods, 2¹/₂ months and 3 months, but quit. In July 1978, claimant began working for American Hoechst, employer's predecessor in interest. Employer purchased the plant in 1986, at which time claimant was laid off. Claimant returned to work for employer in 1990. While she was laid off, claimant worked as a dental hygienist and a waitress. She returned to work for employer because she could earn more money.

When she began working for American Hoechst in 1978, claimant worked as an extrusion operator for less than six months. That posi-

---

[1]Renamed the Illinois Workers' Compensation Commission. See Pub. Act 93—721, eff. January 1, 2005.

[2]Claimant originally filed her claim under the Workers' Compensation Act (820 ILCS 305/1 et seq. (West 1994)). The Commission recognized that the claim should have been filed under the Workers' Occupational Diseases Act and therefore treated it as such.

tion involved mixing batches of chemicals and pouring them into the extruder. During most of her tenure, claimant worked as a poly operator in building 4 on the plant site. She worked significant overtime in this position, which involved the manufacture of polysterene pellets. Claimant spent part of her time in the control room using a computer. Also, her duties involved adding chemicals, including styrene monomers, which is a catalyst, and flame retardants to the batch tanks. Claimant identified another chemical, pentane, that also was present in the tanks. Every 30 minutes, claimant had to go onto the production floor to take samples of the batches. This involved opening the sample port and dipping a test tube attached to a stick into the batch. The chemical mixture was hot, approximately 240 degrees, and "steam and fumes just boiled out." The fumes had an odor similar to that of a petroleum product. The sample port was kept open no longer than five minutes. When the batch was complete, claimant dumped the contents of the tanks into a wash basin. Claimant testified that, during the time that she was exposed to the contents of the tanks, she experienced burning in her eyes, nose, and lungs; coughing; and difficulty breathing. While testing, claimant wore goggles but had no breathing apparatus.

Claimant testified that she also came into contact with toulene, which was an acetone used to clean the tanks. While using this product, claimant experienced burning in her throat and chest pain that sometimes lasted for days.

The parties stipulated to the admission of material safety data sheets (MSDS) listing the chemicals that were used in employer's manufacturing process during the periods claimant worked for employer. Among the chemicals on the list were styrene monomer, toulene, polysterene, and pentane. The MSDS revealed the following. Inhaling styrene monomer fumes may cause irritation of the respiratory tract and occupational asthma. Overexposure to styrene vapor may cause headache, dizziness, lack of coordination, fatigue, and nausea. Inhalation of high concentrations of toulene may cause headache and dizziness. Inhaling toulene vapor may cause respiratory tract irritation. Inhaling polysterene vapor may cause dizziness, drowsiness, loss of coordination, headache, nausea, and vomiting. Inhalation of vapors or mist may cause irritation of the respiratory tract and delayed lung injury. Inhaling pentane may cause dizziness or difficulty breathing. Potential health hazards are irritation of the respiratory tract, pneumonia, pulmonary edema, and central nervous system depression.

Claimant testified that, between 1978 and 1986, she suffered from colds and bronchitis frequently and constantly felt extremely tired.

When she returned to work at the plant in 1990, claimant worked again as a poly operator and experienced the same symptoms. She felt tired and weak and became sick while cleaning her home or filling her car with gasoline. The odor of a permanent marker or pesticides bothered her. She frequently experienced deep coughing and headaches.

Claimant began treating with Dr. Ramon Inciong, her primary care physician, in December 1992. She complained of head congestion and head, chest, and muscle aches. She reported coughing up green sputum. In June 1993, Dr. Inciong saw claimant and reported that claimant's lungs were clear and there were no signs of wheezing. His impression was acute bronchitis. He prescribed antibiotics and cough medicine.

In 1993, claimant transferred to a building maintenance job that paid less than what she made as a poly operator. She worked 40 hours per week. In her new position, claimant spent about five hours per shift in building 4 and the remainder of her time in employer's office building next to the plant. While cleaning in building 4, claimant experienced burning in her nose and lungs.

On February 22, 1994, claimant was using a 3M spot cleaning product to clean carpeting at work. Shortly thereafter, she began coughing and experienced headache, nausea, weakness, and a sore nose and throat. The MSDS for this product stated that overexposure to vapors may cause respiratory system irritation and light-headedness.

On March 8, 1994, claimant saw Dr. Inciong and reported the carpet cleaning incident. She complained of unproductive coughing and pain in her lungs. Dr. Inciong's impression was asthmatic bronchitis. He noted, "[w]ill treat the patient with Prednisone and [B]iaxin. This may be related to occupation[al] exposures to noxious fumes." Claimant saw Dr. Inciong again on March 22, 1994, and reported that her symptoms had not improved. Dr. Inciong noted that "[t]his is possibly due to smoking. More likely, the story appears that the patient had inhaled fumes at work, and [this] may have caused this prolonged, but hopefully transient phenomenon of bronchospasms and edema of the bronchial linings." He diagnosed early chronic bronchitis, prescribed steroids and inhalers, recommended that claimant stop smoking, and referred claimant to Dr. Bernard Taylor, a pulmonologist.

On March 23, 1994, claimant saw Dr. Taylor. A chest X ray was clear, and pulmonary function tests revealed a reduced $FEV_1$. Dr. Taylor's impression was that the cleaning agent may have caused some type of obstruction, possibly asthma. On April 15, 1994, claimant underwent methacholine challenge and pulmonary function tests. The

results were consistent with reversible airways disease and mild obstructive lung disease. On April 27, 1994, claimant saw Dr. Taylor and complained of shortness of breath and coughing. Dr. Taylor reviewed claimant's test results and diagnosed bronchospastic disease. He mentioned the possibility of claimant finding a different job. He instructed claimant to taper her use of Prednisone and prescribed Proventil and Atrovent inhalers.

On May 25, 1994, Dr. Ricardo Calderon reviewed claimant's medical records at employer's request. He opined that claimant suffered from a mild underlying pulmonary obstructive disease that was probably secondary to her smoking. Claimant appeared to suffer an exacerbation of her underlying disease when exposed to the cleaning solutions. According to Dr. Calderon, claimant seemed "to have been treated appropriately for both the exacerbation as well as her underlying problems."

On June 23, 1994, Dr. Inciong reported that claimant's asthmatic bronchitis had fully resolved. In October 1994, claimant saw Dr. Inciong and complained of a cough that occasionally produced yellow sputum. An X ray taken on October 12, 1994, contained findings consistent with chronic obstructive pulmonary disease (COPD). Dr. Inciong diagnosed acute bronchitis and referred her to the Mayo Clinic.

On November 28, 1994, claimant saw Dr. Edward Rosenow of the Mayo Clinic. Dr. Rosenow diagnosed possible hyperreactive airways disease. In his report, Dr. Rosenow stated that he did not know how to answer whether the cleaning solvent claimant was exposed to on a single occasion precipitated her cough symptoms. He viewed this type of exposure as very unusual in provoking cough. Accordingly, he stated "I can only say it may have aggravated the situation, but most commonly we think of viral tracheobronchitis that sets this off more than anything else, and maybe the two happened to co-exist at the same time."

On April 20, 1995, claimant saw Dr. Inciong and complained of a persistent cough that seemed worse whenever she was at work. She reported that she felt well for two weeks while vacationing in California. Claimant began coughing again, however, because a woman sitting next to claimant during the plane ride home was wearing nail polish. Dr. Inciong diagnosed COPD. He advised claimant to remain off of work for two weeks in an attempt to determine whether her work environment was aggravating her condition.

On April 28, 1995, claimant saw Dr. Inciong again and reported that her cough had subsided and that she was feeling well. Dr. Inciong noted that, during the previous visit, not one minute passed without claimant coughing. The congestion and bronchospasms were evident.

During the April 28 visit, claimant did not cough once and appeared to be feeling much better. She reported that the last time she felt this well was during her California vacation. Dr. Inciong diagnosed acute bronchospasms. He noted that her condition "is most likely related to exposure to the chemicals that she works around at work. It is obvious that she does very well when she gets away from her working environment and as soon as she goes back to work, the cough recurs." He advised claimant to return to work to find out if her cough returns.

On May 19, 1995, Dr. Inciong reported in a letter addressed to employer that claimant had been suffering from chronic respiratory symptoms that had not responded to medication. Claimant's symptoms resolved after remaining off of work for two weeks. When claimant returned to work after her April 28, 1995, visit, her symptoms returned. Dr. Inciong opined that claimant's working environment was the precipitating cause of her illness and all of her symptoms and recommended that she no longer work in such an environment. Claimant left her job with employer shortly thereafter.

On May 24, 1995, claimant saw Dr. Calderon. He diagnosed "breathing disorder, with exacerbations noted due to chemical exposure." He advised claimant that, if two pulmonologists recommended that she should not return to work, then she probably will not be able to return to her former position.

On October 31, 1995, claimant saw Dr. Frank Becker, a pulmonary specialist, at employer's request. Claimant reported that she had suffered from a cough since the carpet cleaning incident in February 1994. Claimant identified the 3M spot cleaner and two other cleaning products to which she was exposed while at work. During the examination, claimant did not exhibit any signs of wheezing, which would have been an indication of asthma or bronchitis. She had a positive reaction to the methacholine challenge, however, which was consistent with reactive airways disease.

Dr. Becker believed that claimant suffered from reactive airway disease but that the etiology of the condition was in question. He stated that "there is no evidence in the literature that any of the substances to which [claimant] was exposed can cause reactive airway disease. In contrast, there is a plethora of evidence *** that unequivocally does indicate that smoking causes reactive airway disease." Accordingly, Dr. Becker opined that it was significantly more likely that claimant's condition was the result of smoking rather than any chemical exposure. He recommended avoiding exposure to the cleaning product if it was irritating claimant. Claimant suffered from no condition, however, that would prevent her from working. During his deposition, Dr. Becker opined that there is very little scientific evidence to suggest that MCS exists as a syndrome or a diagnosis.

Dr. Becker testified that claimant attributed her symptoms only to the cleaning product to which she had been exposed and did not refer to any other chemicals. He explained that he had a difficult time obtaining the specifics of what claimant did at employer's plant before becoming a maintenance worker. Because most of the history claimant provided seemed to focus on the cleaning products as the source of claimant's complaints, Dr. Becker focused on those chemicals. He acknowledged that his impression when he examined claimant was that she had only a minimal exposure to chemicals.

Also, Dr. Becker acknowledged that there is a link between certain chemicals used in plastics manufacturing and obstructive lung disease. He opined, however, that the "fact that she was having these attacks in public would [suggest] that it did not have anything to do with what was going on at work."

Claimant saw Dr. Inciong twice in December 1995. She complained of cough, body aches, weakness, dizziness, and stomach and back pain.

On March 28, 1997, claimant began treating with Dr. Marsha Vetter. Dr. Vetter has an M.D. and a Ph.D. in microbiology and immunology and specializes in environmental medicine. Claimant complained of fatigue, burning in the nose and chest, dizziness, weakness, and difficulty concentrating. She reported that, since leaving her job with employer, she had been limiting her exposure to chemicals and was doing fairly well.

Skin testing revealed sensitivity to, among other things, formaldehyde; orris root, which is a component of perfumes; phenol; and diesel fuel. Dr. Vetter started claimant on a variety of supplements to boost her immune system, antioxidants, and inhalant antigens. Claimant saw Dr. Vetter three more times, the last visit being on April 10, 1998. In April 1998, claimant reported that the inhalant helped but still complained of fatigue, burning nostrils, and chest pain.

During her deposition, Dr. Vetter explained that susceptibility to chemicals can be the result of cumulative exposures. "It can persist and it can spread until it involves a wide variety of chemical compounds that were never a problem before ***. And, why this occurs physiologically, I believe no one knows the answer."

Dr. Vetter acknowledged that MCS is very controversial. She explained that

"a pulmonologist is not going to believe that chemical sensitivity exists because they say there is no literature. *** [T]he literature that they read is different than the literature we read. They don't consider that anything significant. ***

*** [W]e also have a peer review journal, but, *** because they've been told in medical school and along their training that this is not

science, they're not going to pay any attention to any of that literature."

Dr. Vetter testified that she relied on materials published by the American Academy of Environmental Medicine and Dr. William Rea's treatise on chemical sensitivity (W. Rea, Chemical Sensitivity (1995)). According to Dr. Vetter, Dr. Rea "is an internationally recognized expert on chemical sensitivity, also a controversial individual."

Dr. Vetter opined that claimant's history and symptoms were consistent with chemical sensitivity. She reviewed the MSDS for the cleaning product claimant used in February 1994 and noted that it stated that exposure to the vapors could cause respiratory system irritation and lightheadedness. Dr. Vetter explained that claimant's development of chemical sensitivity was a cumulative process involving repeated low-level exposures with the triggering event being the exposure to the cleaning product in February 1994. Also, Dr. Vetter reviewed the MSDS describing other chemicals present in claimant's workplace and opined that these substances could cause chemical sensitivity. She noted that the MSDS for several of the chemicals stated that the symptoms of exposure included headache; dizziness; and eye, nose, and throat irritation. Dr. Vetter opined that "after her 14 years of working in the chemical plant and her exposure to the cleaning products, [claimant] had definitely gotten to a point where she was very sensitive to a variety of different compounds." She acknowledged that it was likely that both claimant's smoking and her chemical exposures at employer's plant contributed to claimant's chronic cough. Claimant needed to be in an environment where she could control her exposure to chemicals. Accordingly, a chemical plant was not an ideal place for claimant to work. Also, because there are many chemicals present in a dentist's office, claimant should not return to work as a dental hygienist. Dr. Vetter opined that claimant's condition was permanent.

Dr. Vetter explained that there was no inconsistency between her diagnosis and the earlier diagnosis of bronchitis. She agreed that claimant's history of smoking contributed to her condition.

On December 16, 1997, claimant saw Dr. Katherine Duvall and complained of coughing, weakness, shakiness, and nose and throat soreness exacerbated by certain fumes and odors such as those of cleaning compounds, perfumes, insecticides, hair spray, nail polish, and gasoline. Dr. Duvall diagnosed chronic obstructive lung disease which was most likely related to claimant's smoking and exacerbated by her exposure to cleaning solvents while working for employer. Dr. Duvall believed that claimant's condition likely was permanent. Dr. Duvall felt that the MCS diagnosis was more controversial. In some

respects, claimant did not qualify for such a diagnosis because one of the criteria is normal pulmonary test results, which claimant did not have. Claimant's chemical sensitivity likely was related to her hyper-reactive airways disease. Such chemical sensitivity was not an unusual complaint for individuals with reactive airway dysfunction syndrome. Dr. Duvall recommended that claimant avoid respiratory irritants when possible.

During his deposition, Dr. Inciong testified that, when a person has a reactive airways disease, there are different irritants that can trigger bronchial spasms. Those irritants can be anything in the air such as an infectious agent, pollen, dust, or chemicals. When asked whether a chemical sensitivity could trigger bronchitis, Dr. Inciong stated, "she does have a sensitivity. *** When I say that, I'm raising the possibility that she's *** sensitive to the chemical. So, yes, it would be a chemical sensitivity." Also, if a patient was sensitive to one chemical, he or she may potentially become sensitive to any number of chemicals or other irritants. Dr. Inciong opined that claimant's exposure to chemicals at work was a causative factor in her condition of ill-being. He acknowledged that claimant's condition did not fit neatly into any single, simple diagnosis.

A pulmonary function test conducted in June 1999 revealed results consistent with COPD. Dr. Inciong did not see claimant from 1996 until December 1999. He was aware that, during that period, claimant was treating with other physicians for her pulmonary condition. In December 1999, claimant complained of cough, wheezing, and short-ness of breath that became worse when she left her home. Dr. Inciong prescribed inhalers and medications and instructed her to avoid environments that were likely to trigger her symptoms.

Respondent offered the evidence deposition of Dr. Marcus Bond, who specialized in occupational medicine and toxicology. He no longer treated patients and instead did consulting work for companies in the chemical industry. Dr. Bond never examined claimant but had reviewed her medical records. His report referenced the MSDS for 13 common chemicals "used by janitors and others for maintaining a clean and sanitary building environment." Dr. Bond testified that he also reviewed the MSDS of four chemicals used in employer's manufactur-ing process. According to Dr. Bond, the American Medical Association, the American Academy of Allergy and Immunology, the American Col-lege of Physicians, and the American College of Occupational and Environmental Medicine do not recognize MCS as a condition that can be verified through established scientific procedures. Dr. Bond opined that there was no scientific basis for recognizing MCS as an illness.

Employer introduced as deposition exhibits several medical journal

articles addressing MCS. Representative of the conclusions that the authors of these articles reached is the following conclusion of the Council on Scientific Affairs of the American Medical Association: "(1) there are no well-controlled studies establishing a clear mechanism or cause for [MCS]; and (2) there are no well-controlled studies providing confirmation of the efficacy of the diagnostic and therapeutic modalities relied on by those who practice clinical ecology." Council on Scientific Affairs, *Council Report: Clinical Ecology*, 268 JAMA 3465, 3467 (1992).

Accordingly, Dr. Bond disagreed with Dr. Vetter's diagnosis. He testified that Dr. Vetter was not able to explain why she believed claimant suffered from MCS. Also, all of the testing that Dr. Vetter performed on claimant, such as blood and urine tests, yielded normal results.

Dr. Bond toured employer's plant. He did not notice any chemical odors and did not observe any operations that would have allowed styrene or pentane vapors to be present in the plant's atmosphere.

Dr. Bond believed that claimant suffered from mild chronic obstructive lung disease caused by smoking and that her condition improved after she stopped smoking. Dr. Bond also believed that claimant could work. He did not believe that any of the chemicals described in the MSDS were a contributing cause of claimant's condition and did not see anything in the materials that he reviewed indicating that anything other than smoking caused claimant's condition. When asked whether any of the chemicals used in the manufacture of polysterene pellets could cause reactive airways disease, Dr. Bond replied, "you'd have to figure in a dose because, obviously, most people don't get reactive airways disease *** who work with monomers or pentane or polysterene and so on."

In 1999, claimant began receiving social security disability benefits. At the time of the hearing, claimant had been using oxygen for about six years. Being near cologne or cleaning agents was difficult for claimant. She generally stayed at home and avoided any cleaners or hygienic products that were scented. Neighboring farmers notified claimant when they planned to spray pesticide, and claimant stayed with her daughter while the crops were being sprayed.

In 1998, claimant started her own business, Valley Massage and Reflexology, which she ran out of her home. She used only unscented oils and instructed her clients not to wear any perfume or other chemicals. Claimant earned $1,331 in 1999, $1,327 in 2000, and $1,154 in 2001.

An arbitrator awarded claimant $13,309 in medical expenses and found that she was permanently and totally disabled. The arbitrator

found that claimant's exposure to chemicals during the course of her employment with employer was a cause of her present condition of ill-being. The arbitrator ruled that Dr. Vetter was qualified to testify as an expert about causation.

The Commission found that claimant was temporarily totally disabled from March 15, 1994, through May 8, 1994, or 12³/₇ weeks, and awarded claimant $1,010.57 in medical expenses. The Commission ruled that, because MCS is not sufficiently established to have gained general acceptance in the medical community, Dr. Vetter's testimony about claimant's MCS diagnosis and causation should not have been admitted. According to the Commission, claimant's condition was best described by Dr. Inciong and others as obstructive lung disease with a reactive component. Claimant's condition before February 22, 1994, was a "smoking/viral" related condition and was unrelated to her work environment. Claimant's February 22, 1994, exposure did not result in any serious or permanent disablement. Claimant returned to unrestricted work on May 9, 1994, and, on June 23, 1994, Dr. Inciong noted that claimant's asthmatic bronchitis was fully resolved. Claimant's subsequent persisting problems represented her preexisting, baseline smoking/viral condition.

The Commission found further that, even if claimant's current condition of ill-being was causally related to her work environment, there was no basis for awarding permanent total disability benefits. According to the Commission, no physician opined that claimant was permanently and totally disabled, and there was no basis to conclude that claimant was obviously permanently and totally disabled. Although there was evidence that claimant could not return to her job with employer, the evidence did not establish that she could not work anywhere else. There was no evidence of a job search or expert vocational testimony to establish that claimant fell in the "odd-lot" category.

The trial court confirmed the Commission's decision. Claimant timely appealed.

## III. DISCUSSION

### A. Admissibility of Expert Testimony on MCS

■ Claimant argues that the Commission improperly excluded Dr. Vetter's testimony about MCS. Except when the Act provides otherwise, the Illinois rules of evidence govern proceedings before an arbitrator or the Commission. 50 Ill. Adm. Code § 7030.70(a), as amended by 20 Ill. Reg. 4053 (eff. February 15, 1996); *National Wrecking Co. v. Industrial Comm'n*, 352 Ill. App. 3d 561, 566 (2004). In Illinois, the admission of expert testimony is governed by the standard

first expressed in *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923). *In re Commitment of Simons*, 213 Ill. 2d 523, 529 (2004). Commonly called the "general acceptance" test, the *Frye* standard dictates that scientific evidence is admissible at trial only if the methodology or scientific principle upon which the opinion is based is " 'sufficiently established to have gained general acceptance in the particular field in which it belongs.' " *Simons*, 213 Ill. 2d at 529-30, quoting *Frye*, 293 F. at 1014.

"General acceptance" does not mean universal acceptance, and it does not require that the methodology in question be accepted by unanimity, consensus, or even a majority of experts. *Simons*, 213 Ill. 2d at 530. Instead, it is sufficient that the underlying method used to generate an expert's opinion is reasonably relied upon by experts in the relevant field. *Simons*, 213 Ill. 2d at 530. The lower tribunal's *Frye* analysis is subject to *de novo* review. *Simons*, 213 Ill. 2d at 531. In conducting such review, the reviewing court may consider not only the record but also, where appropriate, sources outside the record, including legal and scientific articles and court decisions from other jurisdictions. *Simons*, 213 Ill. 2d at 531.

■ We note that, generally, if the proposed testimony concerns a syndrome that has not yet been admitted in Illinois, then the trial court should conduct a *Frye* hearing to determine the scientific validity, or invalidity, of the syndrome. *People v. Shanahan*, 323 Ill. App. 3d 835, 838-39 (2001). During a worker's compensation arbitration hearing, most expert testimony is received via evidence depositions. In most cases, it would be impractical and inconsistent with the general nature of worker's compensation proceedings to require a separate *Frye* hearing with live witnesses. Here, the arbitrator and the Commission considered all of the expert deposition testimony and the *Frye* standard and then ruled on the admissibility of claimant's proposed expert testimony. See *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 75-76 (2002), *overruled on other grounds, Simons*, 213 Ill. 2d at 532 (the trial court's error, if any, in failing to hold a formal *Frye* hearing was harmless where the issue of the admissibility of the experts' testimony had come before the trial court in previous motions, during which the trial court became well versed in the experts' methodologies and dealt with the issues it would have addressed in a formal *Frye* hearing). The arbitrator and the Commission considered all of the evidence relevant to the *Frye* issue before ruling on the admissibility of Dr. Vetter's testimony and dealt with the issues they would have addressed had a separate *Frye* hearing been held. Therefore, we believe that the procedure employed here was appropriate.

The proponent of expert testimony has the burden of demonstrating that the proffered opinion is worthy of admission into evidence. *Volpe v. IKO Industries, Ltd.*, 327 Ill. App. 3d 567, 576 (2002). Here, claimant has presented nothing to support a conclusion that Dr. Vetter's testimony about MCS satisfies the *Frye* standard. Dr. Vetter herself acknowledged that MCS is controversial and has not been accepted by the mainstream medical community. In support of her opinions, she identified only the literature of MCS proponents. A court must not define the relevant field of experts so narrowly that the expert's opinion inevitably will be considered generally accepted. If the community is defined to include only those experts who subscribe to the same beliefs as the testifying expert, the opinion always will be admissible. The community of experts must include a sufficiently broad sample of experts so that the possibility of disagreement exists. *Canavan's Case*, 432 Mass. 304, 314 n.6, 733 N.E.2d 1042, 1050 n.6 (2000).

Employer has referenced medical literature and court decisions supporting its assertion that the larger medical community does not recognize MCS. In upholding a trial court's decision to exclude expert medical testimony about MCS, one court noted that MCS is not recognized by the American Medical Association and several other medical organizations, including the American College of Physicians, the American Academy of Allergy and Immunology, and the American College of Occupational Medicine. *Alder v. Bayer Corp.*, 61 P.3d 1068, 1081 (Utah 2002). Court decisions addressing the issue overwhelmingly support employer's position. See *Summers v. Missouri Pacific R.R. System*, 132 F.3d 599, 603 (10th Cir. 1997) ("MCS is a controversial diagnosis that has been excluded \*\*\* as unsupported by sound scientific reasoning or methodology"); *Bradley v. Brown*, 42 F.3d 434, 438 (7th Cir. 1994) (MCS's etiology has not progressed from the plausible or hypothetical to knowledge capable of assisting the trier of fact); *Gabbard v. Linn-Benton Housing Authority*, 219 F. Supp. 2d 1130, 1139 (D. Or. 2002) (diagnosis of MCS has not attained general acceptance and is outside the mainstream of medical practice); *Coffey v. County of Hennepin*, 23 F. Supp. 2d 1081, 1086 (D. Minn. 1998) ("federal courts do not consider environmental illness or MCS a scientifically valid diagnosis"); *Frank v. New York*, 972 F. Supp. 130, 136-37 (N.D.N.Y. 1997) ("theory underlying MCS is untested, speculative, and far from general acceptance in the medical or toxicological community"); *Minner v. American Mortgage & Guaranty Co.*, 791 A.2d 826, 850 (Del. 2000) ("Mainstream medicine has neither properly defined nor widely accepted MCS as an organic entity \*\*\* and [t]o this point, most Courts have not recognized the diagnosis of MCS as a scientifically valid diagnosis").

■ Claimant has not cited a decision that would support admitting Dr. Vetter's testimony about MCS. Research has uncovered some authority supporting claimant's position. See *Creamer v. Callahan*, 981 F. Supp. 703, 705 (D. Mass. 1997) (noting that the Social Security Administration recognizes MCS as a medically determinable impairment); *Appeal of Kehoe*, 139 N.H. 24, 648 A.2d 472 (1994) (MCS due to workplace exposure to occupational chemicals is an occupational disease compensable under workers' compensation statute); *SAIF Corp. v. Scott*, 111 Or. App. 99, 103, 824 P.2d 1188, 1190-91 (1992) (evidence sustained finding that heightened sensitivity to chemicals was result of the claimant's exposure to pesticides and herbicides on the job). None of these decisions addressed MCS's acceptance in the medical community, however, and therefore provide no support for admitting Dr. Vetter's opinions pursuant to the *Frye* standard.

We note that our decision is based on the current state of medical science and claimant's failure to meet her burden of demonstrating that Dr. Vetter's opinions should have been admitted. The possibility exists that, as the medical community's understanding of the etiology of MCS grows, so will MCS's acceptance in the medical community and the case for admitting expert testimony about MCS. Because the prevailing view is that the medical community has yet to accept MCS as a clinically valid diagnosis, the Commission properly excluded Dr. Vetter's testimony about MCS.

### B. Causation

Claimant argues that, even if the Commission correctly refused to consider the evidence about MCS, the Commission's causation finding is against the manifest weight of the evidence. Claimant stresses that several of her treating physicians opined that her work environment exacerbated her pulmonary condition.

■ To recover compensation under the Act, a claimant must prove both that he or she suffers from an occupational disease and that a causal connection exists between the disease and his or her employment. *Anderson v. Industrial Comm'n*, 321 Ill. App. 3d 463, 467 (2001). An occupational activity need not be the sole or principal causative factor, as long as it was a causative factor in the resulting condition of ill-being. *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 205 (2003); *Freeman United Coal Mining Co. v. Industrial Comm'n*, 308 Ill. App. 3d 578, 586 (1999).

Employers take their employees as they find them. *Fitts v. Industrial Comm'n*, 172 Ill. 2d 303, 309 (1996). Thus, even though an employee has a preexisting condition that may make him or her more vulnerable to injury, recovery will not be denied where the employee

can show that a work-related condition aggravated or accelerated the preexisting disease such that the employee's current condition of ill-being can be said to be causally related to conditions in the workplace and not merely the result of a normal degenerative process of the preexisting condition. *Sisbro*, 207 Ill. 2d at 204-05; *General Cooperage Co. v. Industrial Comm'n*, 284 Ill. App. 3d 936, 940 (1996).

Whether a causal connection exists is a question of fact for the Commission, and a reviewing court will overturn the Commission's decision only if it is against the manifest weight of the evidence. *Peabody Coal Co. v. Industrial Comm'n*, 349 Ill. App. 3d 493, 497 (2004). It is the Commission's duty to resolve conflicts in the evidence, particularly medical opinion evidence. *Peabody Coal Co. v. Industrial Comm'n*, 355 Ill. App. 3d 879, 882 (2005). The test is whether the evidence is sufficient to support the Commission's finding, not whether this court or any other tribunal might reach an opposite conclusion. *Freeman*, 308 Ill. App. 3d at 585. For the Commission's decision to be against the manifest weight of the evidence, the record must disclose that an opposite conclusion clearly was the proper result. *Vogel v. Industrial Comm'n*, 354 Ill. App. 3d 780, 786 (2005).

The general consensus among the physicians in this case was that claimant suffered from a pulmonary condition such as reactive airways disease or COPD. Several of claimant's treating physicians opined that claimant's work environment exacerbated her condition. Employer offered the opinions of Drs. Becker and Bond. Dr. Becker, who performed an independent medical evaluation, opined that it was significantly more likely that claimant's condition was the result of smoking rather than any chemical exposure. Dr. Bond, who reviewed claimant's medical records and toured employer's plant, likewise opined that claimant's condition was attributable solely to smoking.

Although the evidence here was closely balanced, the Commission was free to adopt the opinions of employer's experts that claimant's condition was purely smoking related. Claimant argues that the opinions of Drs. Becker and Bond are flawed because they are based on the incorrect assumption that the only chemical exposures involved were exposures to the cleaning chemicals claimant used during the short time she worked in maintenance. Although it is true that the initial reports of Drs. Becker and Bond considered only claimant's exposure to cleaning chemicals, both physicians clarified their opinions during their depositions.

The overall theme of Dr. Becker's analysis was that it was very unlikely that any work-related chemical exposure caused claimant's pulmonary condition. During his deposition, Dr. Becker was presented with more information about the nature of claimant's chemical

exposures at work. He testified that the fact that claimant suffered attacks away from work suggested that her work environment was not a cause of her condition.

Dr. Bond testified that he reviewed the MSDS of four chemicals used in employer's manufacturing process. He had reviewed claimant's medical records and was aware of the opinions expressed therein. He toured employer's plant and testified that he did not notice any chemical odors and did not observe any operations that would have allowed styrene or pentane vapors to be present in the plant's atmosphere. After being presented with more information about the nature of claimant's duties and her chemical exposure, Dr. Bond opined that it was unlikely that any chemical exposure caused claimant's pulmonary condition and did not see anything in the materials indicating that anything other than smoking caused claimant's condition.

■ The Commission adopted the theory that claimant's February 1994 exposure to the cleaning chemicals temporarily exacerbated her underlying pulmonary condition and that she reached maximum medical improvement by June 1994. There is evidence to support this position. Dr. Calderon opined that claimant suffered from a mild underlying pulmonary obstructive disease that was probably secondary to her smoking and appeared to suffer an exacerbation of her underlying disease when exposed to the cleaning solutions. In March 1994, Dr. Inciong diagnosed asthmatic bronchitis and in June 1994 determined that this condition had resolved. The Commission found the asthmatic bronchitis to be the result of the exposure to the cleaning chemicals and that her subsequent persisting problems represented her preexisting, baseline smoking/viral condition. Although the evidence potentially supports other explanations of claimant's symptoms, the Commission's finding on this issue is not against the manifest weight of the evidence.

## IV. CONCLUSION

The Commission was correct to exclude expert opinion evidence on MCS, and its decision is not against the manifest weight of the evidence. Accordingly, the judgment of the circuit court of La Salle County, confirming the Commission's decision, is affirmed.

Affirmed.

McCULLOUGH, P.J., and HOFFMAN, HOLDRIDGE, and DONOVAN, JJ., concur.