PIASA MOTOR FUELS, Appellant, v. THE INDUSTRIAL COMMISSION *et al*. (Kenneth Ruyle, Appellee).

Fifth District (Illinois Workers' Compensation Commission Division)
No. 5—05—0570WC

Opinion filed October 23, 2006.

McCULLOUGH, P.J., specially concurring, joined by HOLDRIDGE, J.

D. Scott Murphy, of Livingstone, Mueller, O'Brien & Davlin, P.C., of Springfield, for appellant.

Edward W. Unsell, of Law Office of Edward W. Unsell, of East Alton, for appellee Kenneth Ruyle.

JUSTICE CALLUM delivered the opinion of the court:

# I. INTRODUCTION

Claimant, Kenneth Ruyle, filed an application for adjustment of claim under the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2002)) for injuries he allegedly sustained while working for employer, Piasa Motor Fuels. The arbitrator denied benefits. The Industrial Commission[1] (Commission), in a decision signed by Chairman Dennis R. Ruth and two commissioners, reversed. It awarded claimant 24 weeks' temporary total disability (TTD) benefits and $95,915.50 in medical expenses and found that claimant was disabled to the extent of 25% of a person as a whole. The circuit court confirmed the Commission's decision. Employer appeals, arguing that the Commission's decision is void because Chairman Ruth participated in the decision and that the Commission's causation finding is against the manifest weight of the evidence.

# II. BACKGROUND

An arbitration hearing was held on November 27, 2002. Claimant, age 45, testified that he worked for employer as a tanker-truck driver. On September 21, 2001, claimant was at the Sauget terminal loading his truck with gasoline to transport it to a station in Missouri. Claimant explained that he used a riser, which is a 6- or 8-inch-diameter steel pipe, to fill his truck with gasoline. The riser comes up from ground level to a height of about eight feet. It has a hinge or spring

---

[1]Now known as the Illinois Workers' Compensation Commission. See Pub. Act 93—721, eff. January 1, 2005.

and moves horizontally about four feet. It also has a large pipe that dangles vertically from it about three or four feet and comes down about waist height. The end of the riser has a large, pumpkin-like valve that is connected to a valve on the side of the truck. The riser is composed entirely of steel piping. Claimant estimated that the riser weighs about 200 pounds. A user, however, does not have to lift this weight because the riser is suspended. Claimant further explained that the user moves the riser and "fights" the weight of the spring to connect the riser to the tanker. This can be done with one hand; however, claimant usually used two hands and wore rubber gloves because the springs were typically covered with oil or gasoline.

On September 21, 2001, claimant was filling his truck with three risers. After he was finished with one riser, he disconnected it and pushed it to his left out of the way about 20 feet. He explained that, as he bent over and capped off one of the compartments, the riser that he had pushed out of the way swung back and struck him in the back on the left side of his spine. It skidded across the top of his hip bone and went into the soft area to the left of his spine and below his rib cage. Claimant did not fall but was knocked against the riser that was connected to the tanker. He stood and backed away from the riser and moved it out of the way. Claimant then finished loading his truck and delivered the load to the O'Fallon station in Missouri.

On his way to Missouri, claimant encountered traffic congestion. Once he arrived at the station, he purchased a sandwich and began unloading his truck. He observed a couple next to his truck arguing. As he listened to them, his stomach began to hurt. At this time, he attributed the pain to the stress of listening to the couple and the traffic congestion. During his run back to Illinois, claimant again encountered traffic congestion. He testified that he became frustrated and started experiencing chest pains. Claimant returned to the Sauget terminal and again loaded his truck to make deliveries to the Imperial and Festus stations. While at the Imperial station, claimant experienced "fairly severe" chest pains and was feeling queasy. When he reached the Festus station, his pain was "letting up a little bit." Claimant completed his shift that day. He was scheduled to work the following day, but called in sick because he was experiencing stomach and chest pains. The pain was in the same general area as constipation pain he felt in the spring of 2001, but the pain was of a different type. Claimant explained that his stomach hurt and he would experience constipation for five-day periods. His primary care physician performed various diagnostic tests. According to claimant, the results were negative.

Claimant returned to work the next day, a Sunday. His chest pains had let up "quite a bit." There was not a lot of work, and claimant

was able to complete his assignments. Claimant was off of work on Monday and stayed in bed. When he woke up Tuesday morning, he felt stomach and chest pains. He completed a short route at work. When he returned home, his stomach pain worsened. Claimant went to the emergency room.

In a history he provided to emergency room personnel, claimant stated that he had driven in heavy traffic the previous day and felt that he had experienced an anxiety attack. He came under Dr. Maudie Miller's care. In her September 25, 2001, office notes, Dr. Miller noted that claimant had been having abdominal pain for several months, but also noted that she could not "elicit a clear-cut history of trauma." Claimant conceded that he told emergency room personnel that he had been experiencing pain for several weeks. He further testified that he did not inform hospital personnel about the incident involving the riser because he was in pain and did not know what was going on. On the same day, he underwent a splenectomy and evacuation of an intra-abdominal hematoma. Dr. Miller's operative notes state that she suspected claimant's condition was related to trauma, "although [claimant] cannot give me a history of trauma." He spent five days in the hospital. According to claimant, Dr. Miller asked him if he was struck, but he could not remember precisely what he told her because he was in intense pain and had difficulty concentrating. An October 4, 2001, office note states that Dr. Miller discussed with claimant whether there was a trauma and that claimant could not recall anything severe enough to cause a splenic trauma. Several days after he was discharged, claimant's toes began to swell and turned black and blue. He saw Dr. Miller, who again asked claimant if he was struck by anything. At this time, claimant related to her the riser incident. He testified that he had pieced it together two days before his appointment. In her October 16, 2001, office notes, Dr. Miller wrote that claimant was able to recall an episode of trauma that occurred on September 21, 2001, at work. Tests revealed that claimant's platelet count was up. Dr. Miller prescribed aspirin and Plavix.

Shortly after this time, claimant began experiencing severe left shoulder pain. An ultrasound revealed fluid buildup in the area. Claimant underwent several aspirations of the shoulder area. Medical personnel punctured claimant's lung when they attempted to insert a catheter to drain his shoulder. He subsequently came under Dr. Steven Strasberg's care. On November 13, 2001, claimant underwent a vascular interventional radiology replacement of his present drain. Dr. Strasberg's discharge summary notes state that claimant suffered a splenic rupture following a traumatic injury.

According to claimant, on October 8, 2001, he first notified

employer that his condition might be related to the riser incident. Specifically, he notified Matt Schrimpf. He conceded that he spoke to Schrimpf and Bob Long, employer's dispatcher, three times before October 8, 2001, and did not mention to them his work accident. Claimant denied ever having mononucleosis.

Dr. Strasberg released claimant to full-duty work on March 11, 2002. Claimant worked for five days and then was terminated.

Claimant explained that he feels that he has aged 5 or 10 years since the riser incident. He experiences stomach pain and pain at the incision point, which increases with activity. He also experiences pain at the entry point of the catheter drain. Claimant cannot eat spicy foods. He also cannot drink soda pop without food. He explained that he generally feels weak. Claimant continues to experience shoulder pain and has week-long headaches. Claimant never experienced these symptoms before his work accident. He has not worked since being terminated by employer.

Matthew Schrimpf, employer's operations manager, testified on employer's behalf as follows. He examined the riser that allegedly struck claimant and testified that it would not go past the resting position. He could not duplicate the incident as claimant described it. Schrimpf explained that the spring-loaded apparatus moved the riser only up and down. He was first notified of claimant's alleged accident on October 8, 2001. Between September 25 and October 8, 2001, he spoke with claimant on one occasion; he also spoke twice with Bob Long, who was unaware of the cause of claimant's medical problems.

Dr. Mark Kuhnke reviewed claimant's medical records at employer's request. In a letter dated April 22, 2002, Dr. Kuhnke opined that it was doubtful that claimant's ruptured spleen was causally related to his alleged work accident. He explained that claimant had complained for several months of flank pain; however, there was no report of fractured ribs or a history of flank ecchymoses. Dr. Kuhnke also noted that claimant's spleen was not actually fractured, but had a subcapsular hematoma, which is not what he would have expected following a direct blow. He wrote that other causes of spontaneous splenic bleeding include mononucleosis. However, Dr. Kuhnke further opined that he could not completely rule out a causal connection. He also opined that claimant's pancreatic fistula was related to the splenectomy.

On January 17, 2003, the arbitrator denied benefits, finding that claimant's accident did not arise out of or in the course of his employment. Specifically, the arbitrator found claimant's testimony incredible, noting that he testified about a traumatic event but could not give a history to medical personnel five days after the alleged event occurred. The arbitrator further noted that claimant spoke to employer

on three occasions without giving a history of his accident. Also, the arbitrator found Schrimpf's testimony credible.

On December 27, 2004, the Commission, in a decision signed by Chairman Dennis R. Ruth and Commissioners Paul Rink and Barbara Sherman, reversed. It found that claimant was temporarily totally disabled for 24 weeks, that his work-related injuries resulted in a 25% loss of use of a person as a whole, and that claimant was entitled to $95,915.50 in medical expenses. The Commission found it significant that Dr. Miller suspected trauma from the outset and that Dr. Kuhnke opined that claimant's injury could have caused his splenic problem and pancreatic condition. Also, the Commission found that, given claimant's previous bouts with constipation, it was credible that claimant initially failed to associate his symptoms with his September 21, 2001, work accident.

The circuit court, on September 21, 2005, confirmed the Commission's decision. The court further found that it was not necessary for it to consider the propriety of Chairman Ruth's participation in the decision. However, the court noted that, assuming his participation was improper, the decision was signed by two members and, therefore, was valid. Further, the court determined that, if it had to consider Chairman Ruth's participation, section 13 of the Act (820 ILCS 305/13 (West 2002)) does not preclude the Chairman from serving on a panel because that provision states that the Chairman does not have final authority in the determination of cases. Employer timely appealed.

## III. STANDARDS OF REVIEW

The first issue requires us to interpret section 13 of the Act. This presents a matter of statutory construction, which is a question of law that we review *de novo. Cassens Transport Co. v. Industrial Comm'n*, 218 Ill. 2d 519, 524 (2006).

The second issue we address is causation. Whether a causal connection exists is a question of fact for the Commission, and a reviewing court will overturn the Commission's decision only if it is against the manifest weight of the evidence. *Bernardoni v. Industrial Comm'n*, 362 Ill. App. 3d 582, 597 (2005). The test is whether the evidence is sufficient to support the Commission's decision, not whether this court or any other tribunal might reach an opposite conclusion. *Bernardoni*, 362 Ill. App. 3d at 597. The Commission's decision is against the manifest weight of the evidence where the record discloses that an opposite conclusion clearly was the proper result. *Bernardoni*, 362 Ill. App. 3d at 597.

## IV. ANALYSIS

### A. Composition of Commission Panel

Employer argues first that Chairman Ruth acted contrary to the Act when he participated in the Commission's decision in this case and, therefore, the decision was void as a matter of law. Initially, employer contends that Chairman Ruth was acting in opposition to the plain language of section 13 of the Act when he participated "in the determination of" a case thereunder. 820 ILCS 305/13 (West 2002).

In interpreting the Act, the best indication of legislative intent is the plain and ordinary meaning of the statutory language. *Hamilton v. Industrial Comm'n*, 203 Ill. 2d 250, 255 (2003). When the language is clear and unambiguous, we must apply it as written without reading into it exceptions, limitations, or conditions not expressed by the legislature. *Mahoney v. Industrial Comm'n*, 218 Ill. 2d 358, 363-64 (2006). We presume the legislature did not intend absurdity, inconvenience, or injustice. *Mahoney*, 218 Ill. 2d at 364. Further, we interpret the Act liberally to effectuate its main purpose: providing financial protection for injured workers. *Cassens Transport Co.*, 218 Ill. 2d at 524.

Section 13 of the Act provides, in relevant part:

"There is created an Industrial Commission consisting of 7 members to be appointed by the Governor, by and with the consent of the Senate, 2 of whom shall be representative citizens of the employing class operating under this Act and 2 of whom shall be representative citizens of the class of employees covered under this Act, and 3 of whom shall be representative citizens not identified with either the employing or employee classes. Not more than 4 members of the Commission shall be of the same political party. One of the 3 members not identified with either the employing or employee classes shall be designated by the Governor as Chairman. *The Chairman* shall be the chief administrative and executive officer of the Commission; and he or she *shall have* general supervisory authority over all personnel of the Commission, including arbitrators and Commissioners, and *the final authority in all administrative matters relating to the Commissioners*, including but not limited to the assignment and distribution of cases and assignment of Commissioners to the panels, *except* in the promulgation of procedural rules and orders under Section 16 and *in the determination of cases under this Act*." (Emphasis added.) 820 ILCS 305/13 (West 2002).

We disagree with employer's contention that the foregoing emphasized language precludes the Chairman's participation in a decision. Section 13 is clear that the Chairman is a commissioner. Although

he or she has general supervisory authority over the commissioners, the provision limits the Chairman's powers with respect to the determination of cases by specifying that he or she has no final authority thereunder. "The Chairman *** shall have *** *the final authority* in all administrative matters relating to the Commissioners *** except *** in the determination of cases under this Act." (Emphasis added.) 820 ILCS 305/13 (West 2002). We read the statute as granting the Chairman authority to determine cases; however, it does not grant him or her "final authority" to do so. This reading, in our view, is consistent with the statute's plain language and renders no portion meaningless or void. See *Sylvester v. Industrial Comm'n*, 197 Ill. 2d 225, 232 (2001) (court must construe statute so that each word is given a reasonable meaning and not rendered superfluous, thereby avoiding an interpretation that would render any portion of the statute meaningless or void).

■ Second, employer argues that Chairman Ruth has supervisory authority over the other two commissioners who participated in the decision and, therefore, he would have undue influence over any decision issued by that panel. We reject this argument because the Chairman's lack of "final authority" in the determination of cases limits his supervisory authority over the two participating commissioners. Further, we must presume that individuals who serve on administrative tribunals are fair and honest. *Wade v. City of North Chicago Police Pension Board*, 359 Ill. App. 3d 224, 237 (2005). Employer made no showing that the Commission panel was incapable of fairly deciding this case.

■ Third, employer asserts that the Chairman may not fill a vacancy in the office of a commissioner by hearing the case himself or herself and that only the Governor has the authority to make Commission appointments.

Section 13 of the Act provides, in relevant part:

> "Notwithstanding any other provision of this Act, in the event the Chairman shall make a finding that a member is or will be unavailable to fulfill the responsibilities of his or her office, the Chairman shall advise the Governor and the member in writing and shall designate a certified arbitrator to serve as acting Commissioner. The certified arbitrator shall act as a Commissioner until the member resumes the duties of his or her office or until a new member is appointed by the Governor, by and with the consent of the Senate, if a vacancy occurs in the office of the Commissioner, but in no event shall a certified arbitrator serve in the capacity of Commissioner for more than 6 months from the date of appointment by the Chairman." 820 ILCS 305/13 (West 2002).

Employer contends that, as section 13 outlines what happens in the event of a vacancy in the office of a commissioner, the Chairman is precluded from participating in a panel. Again, we disagree. The foregoing provision sets forth only the procedures for temporarily replacing a commissioner. It does not explicitly or, in our view, implicitly preclude the Chairman from serving on a panel.

■ Finally, employer argues that it did not receive notice that Chairman Ruth would participate in the decision in this case and, therefore, employer had no opportunity to object to his participation. Employer cites no authority in support of its argument that it was entitled to notice of the Chairman's participation. Accordingly, the argument is waived. *Eisenberg v. Industrial Comm'n*, 337 Ill. App. 3d 373, 383-84 (2003).

## B. Causation

■ Next, employer argues that, assuming the Commission's decision was valid, its causation finding was against the manifest weight of the evidence. To obtain compensation under the Act, a claimant must show by a preponderance of the evidence that he or she has suffered a disabling injury arising out of and in the course of his or her employment. *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 203 (2003). The "arising out of" component addresses the causal connection between a work-related injury and the claimant's condition of ill-being. *Sisbro, Inc.*, 207 Ill. 2d at 203. A claimant need prove only that some act or phase of his or her employment was a causative factor in his or her ensuing injury. *Vogel v. Industrial Comm'n*, 354 Ill. App. 3d 780, 786 (2005). An accidental injury need not be the sole or principal causative factor, as long as it was a causative factor in the resulting condition of ill-being. *Sisbro, Inc.*, 207 Ill. 2d at 205.

The Commission based its causation finding on Dr. Miller's opinion that claimant's condition was likely caused by a trauma and on Dr. Kuhnke's statement that he could not completely rule out that claimant's injury caused his splenic problem and pancreatic condition. The Commission also found claimant credible and determined that claimant could have initially failed to associate his symptoms with his work accident due to his bouts of constipation.

Employer contends that the Commission erred in adopting Dr. Strasberg's causation opinion because that opinion was speculative. It contends that Commission decisions may not be based on speculation or conjecture. See, *e.g.*, *Palos Electric Co. v. Industrial Comm'n*, 314 Ill. App. 3d 920, 925-26 (2000).

We note initially that the Commission referred to Dr. Miller's notes to Dr. Strasberg, not to Dr. Strasberg's opinion. In her notes,

dated November 12, 2001, Dr. Miller wrote that when she first saw claimant on September 25, 2001, he was unable to provide a history of trauma. However, she further noted that, five days before her discharge notes were dictated, claimant was able to recall his work accident and that "this is probably the etiology of his splenic hematoma although it is still not perfectly clear." Dr. Miller also opined that claimant's pancreatic condition was likely causally related to his work accident. She wrote: "I suspect it is traumatic in nature although he does have a remote history of heavy alcohol use. I suppose it could also represent a neoplasm although it does not appear neoplastic on CT."

We conclude that there was sufficient evidence in the record from which the Commission could reasonably have found a causal connection between claimant's work accident and his condition of ill-being. Dr. Miller's notes state that she suspected a trauma, but could not initially obtain such a history from claimant. She inquired with claimant on several occasions whether there was a trauma, and claimant ultimately recalled his September 21, 2001, incident. The foregoing discharge notes upon which employer relies do not, in our opinion, reflect that Dr. Miller speculated about causation. Her use of the word "probably" does not, in our view, render her statement speculative or conjecture. Indeed, Dr. Kuhnke, employer's medical expert, testified that, although it was doubtful that claimant's ruptured spleen was causally related to his work incident, he could not completely rule out a causal connection. It is the Commission's duty to resolve conflicts in the evidence, particularly medical opinion evidence. *Bernardoni,* 362 Ill. App. 3d at 597. Nevertheless, even if one medical witness is equivocal about causation, it is for the Commission to determine which medical opinion is to be accepted, and it may attach greater weight to the treating physician's opinion. *Homebrite Ace Hardware v. Industrial Comm'n,* 351 Ill. App. 3d 333, 340 (2004).

Further, it was not unreasonable for the Commission to find claimant's testimony credible. Although claimant did not immediately associate his riser incident with the medical complications that resulted in his September 25, 2001, emergency room visit and subsequent medical care, his explanations about his delayed recollection were not inherently unreasonable. Notably, claimant testified that the stomach pains he experienced after his Imperial and Festus runs were different from those he experienced during his constipation episodes in the spring of 2001. He also stated that he did not connect the riser incident to his medical condition because he was experiencing a lot of pain and had difficulty concentrating.

In sum, we conclude that the Commission's causation finding was not against the manifest weight of the evidence.

## V. CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Madison County is affirmed.

Affirmed.

HOFFMAN and GOLDENHERSH, JJ., concur.

PRESIDING JUSTICE McCULLOUGH, specially concurring:

I write this special concurrence only with respect to employer's argument as to the composition of the panel.

Commission Rule 7030.30(d)(2) (50 Ill. Adm. Code §7030.30(d)(2) (amended at 20 Ill. Reg. 3820, eff. February 15, 1996)) provides that when a commissioner withdraws from a case, the Commission will transfer the case to a commissioner of the same statutorily designated class.

The record does not indicate whom Commissioner Ruth replaced, or the basis for him sitting on this case.

The parties, both claimant and employer, should be noticed as to who are the Commission members designated to hear the case. The Act is clear that, where a three-member panel hears oral argument, it "shall be comprised of not more than one representative citizen of the employing class and not more than one representative citizen of the employee class." 820 ILCS 305/19(e) (West 2004). I believe in all cases, the Commission panel should be comprised of one member of the employee class, one member of the employer class, and one member of the public class.

Giving notice to the parties of the panel composition is important. In the recent past, this panel has had before it cases where only two commissioners are shown.

JUSTICE HOLDRIDGE joins in this special concurrence.