2016 IL App (4th) 150088WC

NO. 4-15-0088WC

FILED

July 21, 2016
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

WORKERS' COMPENSATION COMMISSION DIVISION

| | | |
|---|---|---|
| MICHAEL K. DURBIN | ) | Appeal from |
|        Appellant, | ) | Circuit Court of |
| | ) | Macon County |
|        v. | ) | No. 14MR601 |
| | ) | |
| THE ILLINOIS WORKERS' COMPENSATION | ) | |
| COMMISSION *et al.* (Archer Daniels Midland, | ) | Honorable |
| Appellees). | ) | Albert G. Webber, |
| | ) | Judge Presiding. |
| | ) | |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Holdridge and Justices Hoffman, Hudson, and Stewart
concurred in the judgment and opinion.

**OPINION**

¶ 1 On October 15, 2004, claimant, Michael K. Durbin, filed an application for

adjustment of claim pursuant to the Workers' Occupational Diseases Act (Act) (820 ILCS 310/1

to 27 (West 2004)), seeking benefits from the employer, Archer Daniels Midland. (We note,

however, the application for adjustment of claim erroneously reflected it was brought pursuant to

the Workers' Compensation Act.) He alleged to have suffered injury to his lungs in the form of

chronic obstructive pulmonary disease (COPD) due to exposure to irritants, and he listed the date

of injury as June 11, 2003.

¶ 2 Following a hearing, the arbitrator found that claimant failed to prove an

occupational disease caused by workplace exposure and denied him benefits under the Act.

¶ 3 On review, the Illinois Workers' Compensation Commission (Commission) affirmed and adopted the decision of the arbitrator. On judicial review, the circuit court of Macon County confirmed the Commission's decision.

¶ 4 On appeal, claimant argues the Commission erred in (1) barring the causation opinion of his treating physician pursuant to Illinois Rule of Evidence 702 (eff. Jan. 1, 2011) and (2) finding that he failed to prove an occupational disease caused by workplace exposure.

¶ 5 We affirm.

¶ 6 I. BACKGROUND

¶ 7 The following evidence relevant to the disposition of this appeal was elicited at the March 6, 2013, arbitration hearing.

¶ 8 At the time of arbitration, claimant was 59 years old. At the time of his retirement in 2003 at the age of 48, claimant had worked for the employer for approximately 30 years. According to claimant, he had been exposed to a butter flavoring ingredient that contained the chemical diacetyl over a period of 20 years while working for the employer. Claimant testified that as a "pumper loader operator" he was exposed to diacetyl on many occasions, including when he uncapped buckets containing butter flavoring and carried and poured the buckets, changed oil filters, cleaned spillage from the "tank farm" and the "remelt room" floors, cleaned "combinators," and cleaned out sample buckets. In addition, claimant stated that he could smell the butter flavoring throughout the plant.

¶ 9 On cross-examination, claimant testified that he did not know whether diacetyl was used in all the butter flavorings he had contact with and he had no knowledge of the amount of diacetyl used in the butter flavoring. Claimant testified that his job duties did not require him to enter the lab where the butter flavoring was mixed, and he agreed that, with the exception of

opening the lids and pouring the flavoring into the tanks, the process at the plant was a "closed process" where the tanks were sealed and the additives were added through small ports.

¶ 10        Claimant denied having told Dr. Allen Parmet, who conducted an independent medical examination of claimant in July 2006, that he typically poured 12 to 15 buckets a day of butter flavoring that contained diacetyl into the tanks. According to claimant, he may have told Dr. Parmet that he poured 12 to 15 buckets per week. Batch records introduced by the employer showed that during his last 16 months of employment, claimant added butter flavoring to the tanks on 26 occasions. Although claimant stated it "took his breath away" when he opened the buckets of butter flavoring, he acknowledged never having spoken with the employer about the smell. Claimant testified he did not experience burning eyes due to the buttery odor, but he did experience burning nasal passages. However, he never reported this symptom to his treating physicians. Claimant admitted that during his deposition in a pending civil suit against the butter flavor manufacturers, he testified he could not recall whether the butter flavoring had an odor.

¶ 11        Claimant testified that he first noticed problems with his lungs in 2000 or 2001 and began treatment for asthma. He acknowledged having been a smoker "[f]or a few years" and that both his parents were smokers. His mother had been diagnosed with COPD and died at the age of 53. It is unclear from the record whether claimant's mother died from emphysema or stomach cancer. Claimant's father died from coronary disease at the age of 56. Claimant denied having told a treating physician that he started smoking two packs a day at the age of 15. He testified that he smoked his first cigarette when he was 15 years old, but he did not start smoking on a regular basis until he was 27 years of age. At the time claimant quit smoking in 1997 or 1998, he was smoking one pack per day. Both claimant's first wife and current wife also smoked; however, his current wife quit smoking at the same time as claimant.

¶ 12        Claimant testified that he now has a difficult time breathing when he exerts himself, such as doing yard work or walking long distances—a problem he did not have before his work exposure.  He further stated that he can no longer ride a motorcycle "because the air hitting me in the face takes my breath [away]" or water ski, and he is unable to play with his grandchildren as often.  Additionally, claimant is now unable to work on his car, paint cars, garden, or keep his garage clean.

¶ 13        Brian Richardson testified he was the corporate safety and environmental manager for Stratas Foods, a joint venture company started by the employer.  In 1993, he was a "whirl operator" in the whirl room where he made a butter flavoring product.  Richardson had been a pump loader like claimant and had personal knowledge of a pump loader's job duties.  According to Richardson, claimant's job duties as a pump loader would not have included any duties in the whirl room or any duties with respect to cleaning the combinator—a task that would have been completed by maintenance because it was a very detailed job.  Richardson further testified that the job of cleaning the remelt room and floor would have been done by a laborer, not someone in claimant's position.  Richardson stated that while claimant would have cleaned oil filters, he would not have been exposed to diacetyl during that process because the butter flavoring was too thick to run through the filters.  According to Richardson, butter flavored oil constituted approximately 2% to 3% of the employer's business.

¶ 14        On cross-examination, Richardson agreed that claimant's supervisors could have had him perform some of the cleaning tasks that were typically completed by the laborers.  Richardson further testified that in November 2004, the National Institute for Occupational Safety and Health (NIOSH) conducted an evaluation of the employer's plant looking for diacetyl related health hazards.  Following the evaluation, NIOSH recommended that employees wear

organic vapor respirators. Thereafter, the employer provided its employees with the recommended respirators until 2006 when the flavor companies reformulated their product to be diacetyl free.

¶ 15        Kelly Singleton testified that she was employed as a lab technician with the employer in 1995 and was promoted to lab supervisor in 1999. In 2004, she became the quality assurance manager for Stratas Foods. As a lab technician, Singleton mixed the butter flavoring in the lab, broke the seals on the buckets, and opened the bungs on the buckets prior to setting the buckets outside the lab door to be picked up for delivery to the tanks by someone like claimant. Singleton stated that when stainless steel buckets were used, it was common practice to close the buckets with stainless steel lids to protect food integrity. Singleton testified that "[t]o the best of [her] knowledge there was always a lid on it. That was a requirement." According to Singleton, when diacetyl was mixed in with the butter flavoring, it accounted for less than 2% of the mixture. Further, she stated that flavored oils were typically only used at the plant once a week.

¶ 16        Kevin Swanson, the vice president of operations for Stratas Foods and the general manager of the employer's packaging division, testified that he had worked in the employer's packaging plant since 2004. According to Swanson, only 2% to 3% of the plant's total oil production included butter flavorings containing diacetyl.

¶ 17        At arbitration, claimant introduced the evidence deposition of Dr. Donald Gumprecht, taken July 19, 2011. Dr. Gumprecht testified he was a pulmonologist and had been in practice for 32 years. Claimant had been referred to him for a second opinion regarding claimant's lung disease.

¶ 18        Dr. Gumprecht first saw claimant on May 7, 2003, at which time claimant

reported a history of asthma that "had been gradually getting worse." At that time, claimant reported having been exposed to "various products" at the employer's plant, including "caustics, *** soaps and grain dust, anhydrous ammonia, and that he did not wear a respirator." Following his examination, Dr. Gumprecht diagnosed claimant with severe early onset COPD.

¶ 19 Dr. Gumprecht testified that upon learning claimant had been exposed to butter flavoring that contained diacetyl, he was reminded of an article he read in the New England Journal of Medicine titled "Clinical Bronchiolitis Obliterans in Workers at a Microwave-Popcorn Plant," which found a causal connection between butter flavoring containing diacetyl used in plants making microwave popcorn and bronchiolitis obliterans in workers who had been exposed. The employer objected and moved to strike Dr. Gumprecht's testimony regarding the article, asserting "[t]he article is not compliant as a basis pursuant to Illinois Rule of Evidence 702 to support a generally accepted scientific basis for the conclusions." Dr. Gumprecht then testified that based on "other medical literature," including an editorial in the American Journal of Respiratory and Critical Care Medicine titled "Occupational Bronchiolitis Obliterans Masquerading as COPD," as well as unspecified studies on rats, there was no "real dispute" in the medical community regarding whether butter flavoring containing diacetyl could cause lung disease. Over repeated objections by the employer, Dr. Gumprecht testified that a general causal connection existed between diacetyl exposure and lung disease.

¶ 20 Dr. Gumprecht declined to distinguish between whether claimant had COPD or bronchiolitis obliterans at his deposition because "[b]oth are fixed obstructive lung diseases, and in any one patient, it's very difficult to separate them." However, Dr. Gumprecht testified that he "had no doubt [claimant] had popcorn flavoring lung disease." According to Dr. Gumprecht, claimant told him he "had been working with flavorings basically from the 1980s to 2003, that he

could smell the fumes, *** and that he was involved in mixing ***and he believes he was exposed to diacetyl basically the whole time."  Dr. Gumprecht further added that claimant did not wear a respirator mask while he transported the buckets of butter flavoring and poured the flavoring into the tanks.  While Dr. Gumprecht acknowledged claimant's history of smoking cigarettes could be a factor in his COPD, he did not believe smoking was the primary cause due to the early age of onset and that claimant's lung function "deteriorated significantly" after he stopped smoking.  Dr. Gumprecht stated he also ruled out other causes of claimant's lung disease, including asthma and genetic causes.

¶ 21        On cross-examination, Dr. Gumprecht agreed that three computerized tomography (CT) scans of claimant's lungs, taken in July 2003 and February and October 2009, exhibited generalized emphysema in both lungs, a condition commonly seen in smokers.  Dr. Gumprecht further agreed that diacetyl was not a common cause of fixed obstructive lung disease and he had no knowledge regarding the levels of diacetyl that the popcorn plant workers had been exposed to or whether they were exposed to the same product as claimant.  Further, Dr. Gumprecht admitted that he assumed most of the butter flavoring claimant was exposed to contained diacetyl.  The following colloquy ensued:

"Q.  In terms of the opinions you're forming, are you

assuming that any exposure to diacetyl is sufficient to cause the

fixed obstructive lung disease?

A. I'm assuming that exposure to peak exposures would be

sufficient, because we do not know the low limit of safe exposure.

Q. And you don't know the peak exposure?

A.  Correct; but it's smellable, and it's enough for me.

Q. If you can smell it, it's a sufficient exposure?

A. I think you have to assume that.

Q. And you assume that until somebody proves the smell is safe to you?

A. Correct."

¶ 22    The employer introduced the evidence deposition of Dr. Robert J. McCunney, taken May 31, 2012. Dr. McCunney testified that he had been a physician for 35 years and that he had been certified in and practiced occupational and environmental medicine for 30 years. He explained that occupational and environmental medicine is a specialty that involves the recognition and prevention of illnesses and injuries in both the occupational and general environment. According to Dr. McCunney, "an occupational physician has to understand the work environment and the exposures that may contribute to an illness [and] the various hazards in the workplace or the hazards in the environment," while pulmonologists are generally not trained in assessing workplace exposures.

¶ 23    Dr. McCunney testified that he was hired by the employer to review claimant's medical history and to perform a records review. In addition to reviewing records, Dr. McCunney conducted an independent medical examination of claimant and visited the employer's plant to observe the work environment. Dr. McCunney had been an expert witness in two other cases involving "flavoring-induced lung disease" in the three years preceding his retention in this case.

¶ 24    In December 2011, Dr. McCunney diagnosed claimant with COPD "with some evidence of reversibility of his lung function consistent with asthma." According to Dr. McCunney, claimant's pulmonary function studies were "very consistent with his smoking

history.  In fact, they're typical."  In Dr. McCunney's opinion, claimant's work at the employer's plant "played no role in the development of his [COPD] condition."  Instead, Dr. McCunney attributed claimant's COPD to a combination of smoking, chronic asthma, obesity, and family history.

¶ 25        Dr. McCunney acknowledged a link had been established between butter flavoring containing diacetyl and bronchiolitis obliterans in workers employed at certain microwave popcorn plants.  However, based on his review of claimant's medical records, diagnostic studies, imaging studies, and pulmonary function tests, Dr. McCunney concluded that claimant did not have bronchiolitis obliterans.  Dr. McCunney testified that none of claimant's three high resolution CT examination reports revealed a mosaic pattern that he would have expected to see in a patient suffering from bronchiolitis obliterans.  In addition, Dr. McCunney explained that bronchiolitis obliterans is a fixed obstructive lung disease, whereas claimant's pulmonary function studies showed evidence of reversibility.  Further, Dr. McCunney testified if diacetyl played a causal role in claimant's lung condition, he would have expected to see diminished pulmonary function during claimant's employment; however, claimant's pulmonary function studies showed no change between 1995 and 2003.

¶ 26        Dr. McCunney also distinguished between the level of diacetyl exposure experienced at microwave popcorn plants and the employer's plant.  Specifically, he testified that the tanks in microwave popcorn factories are not sealed like the tanks at the employer's plant and that "the proportion of flavorings relative to the amount of oil in the tanks is much lower in the [employer's] plants."  He also noted the frequency of potential exposure at the employer's plant was limited to once or twice per week at most and only when the flavoring was poured into the tanks.  On the other hand, quoting from his report, Dr. McCunney testified as follows:

" 'In most large microwave popcorn plants, workers who develop bronchiolitis obliterans had poured flavorings into open tanks several times per work shift, reflective of higher exposures in that industry, in comparison to [the employer] which manufactures vegetable oils predominately. Based on my discussions with plant personnel during my site visit, less than five percent of the product manufactured at the facility used butter flavorings.' "

He continued as follows:

" 'Since the top of the tanks were otherwise sealed [at the employer's plant], aside from brief periods of pouring the five-gallon [container], opportunity for significant chronic exposure was limited, if present at all. Note that the NIOSH measurements of diacetyl prior to pouring the five-gallon container was zero.

In summary, the NIOSH evaluation of the [employer's] plant in Decatur indicates that the potential for exposure to butter flavorings and the corresponding risk of developing a specific lung disease, known as bronchiolitis obliterans is not present and finds no support by comparison to microwave popcorn plants.' "

Dr. McCunney further explained that NIOSH measured the levels of diacetyl at the employer's plant as the butter flavoring was poured from the five-gallon container into the tank at 0.07 parts per million. According to Dr. McCunney, this measurement was 450 times lower than the levels measured at the microwave popcorn plant.

¶ 27      Dr. McCunney criticized Dr. Gumprecht's opinion that the mere smell of butter

flavoring was enough exposure to cause claimant's lung condition, noting that Dr. Gumprecht's theory failed to distinguish between an odor threshold and a toxic threshold. According to Dr. McCunney, based on studies conducted at the microwave popcorn plants, "[t]he odor threshold of diacetyl is considerably lower than the toxic threshold." Specifically, he noted the odor threshold of diacetyl was 7000 times lower than the toxic levels associated with bronchiolitis obliterans found in the microwave popcorn industry. Dr. McCunney further criticized Dr. Gumprecht's opinion that the smell of the popcorn flavoring could be inhaled deep into the lungs, explaining that diacetyl is a water-soluble compound that is "impacted by the upper respiratory system which *** means the eyes, nose and mouth," whereas "fat-soluble substances can get deeper into the lungs." Lastly, Dr. McCunney criticized Dr. Gumprecht's reliance on an editorial to form his causation opinion, noting "it is not customary scientific practice to refer to an editorial to support causality assessments. Customarily, the original study should be cited." According to Dr. McCunney, a link between diacetyl exposure and COPD has not been generally accepted in the medical community.

¶ 28        On May 9, 2013, the arbitrator issued his decision. As stated, he found that claimant failed to prove an occupational disease caused by workplace exposure. Accordingly, he denied claimant benefits under the Act. On June 30, 2014, the Commission affirmed and adopted the arbitrator's decision. On January 12, 2015, the circuit court of Macon County confirmed the Commission's decision.

¶ 29        This appeal followed.

¶ 30                                II.  ANALYSIS

¶ 31        On appeal, claimant argues that the Commission erred in (1) barring Dr. Gumprecht's causation opinion pursuant to Illinois Rule of Evidence 702 (eff. Jan. 1, 2011) and

- 11 -

(2) finding that he failed to prove an occupational disease caused by workplace exposure.

¶ 32        Initially, we note the record is unclear regarding whether the arbitrator ruled Dr. Gumprecht's causation opinion was inadmissible.  Because the record is unclear, we will address claimant's argument that Dr. Gumprecht's causation opinion withstood the employer's Rule 702 challenge.

¶ 33        "In Illinois, the admission of scientific evidence is governed by the *Frye* standard [citations] which has now been codified by the Illinois Rules of Evidence ***." *In re Detention of New*, 2014 IL 116306, ¶ 25, 21 N.E.3d 406.  See *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).  Rule 702 provides, in relevant part:

> "Where an expert witness testifies to an opinion based on a new or
>
> novel scientific methodology or principle, the proponent of the
>
> opinion has the burden of showing the methodology or scientific
>
> principle on which the opinion is based is sufficiently established
>
> to have gained general acceptance in the particular field in which it
>
> belongs."  Ill. R. Evid. 702 (eff. Jan 1, 2011).

"The purpose of the *Frye* test is to exclude new or novel scientific evidence that undeservedly creates 'a perception of certainty when the basis for the evidence or opinions is actually invalid.' " *Detention of New*, 2014 IL 116306, ¶ 26, 21 N.E.3d 406 (quoting *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 78, 767 N.E.2d 314 (2002), *abrogated on other grounds by In re Commitment of Simons*, 213 Ill. 2d 523, 530, 821 N.E.2d 1184, 1189 (2004)).  We review *de novo* whether a methodology or principle is generally accepted in the relevant scientific community.  *Detention of New*, 2014 IL 116306, ¶ 26, 21 N.E.3d 406.

¶ 34        In determining whether an expert's opinion is admissible under *Frye*, our focus is

on whether the underlying method used to generate the expert's opinion is one that is reasonably relied upon by the experts in the field. *Donaldson*, 199 Ill. 2d at 79, 767 N.E.2d at 325. "If the underlying method used to generate an expert's opinion is reasonably relied upon by the experts in the field, the fact finder may consider the opinion—despite the novelty of the conclusion rendered by the expert." *Id*. at 77, 767 N.E.2d at 324.

¶ 35　　　　　We note the arbitrator here did not conduct a separate *Frye* hearing. However, that does not impair our review. We noted the existence of similar circumstances in *Bernardoni v. Industrial Comm'n*, 362 Ill. App. 3d 582, 594, 840 N.E.2d 300, 310 (2005):

> "During a worker[s'] compensation arbitration hearing, most expert testimony is received via evidence depositions. In most cases, it would be impractical and inconsistent with the general nature of worker[s'] compensation proceedings to require a separate *Frye* hearing with live witnesses. Here, the arbitrator and the Commission considered all of the expert deposition testimony and the *Frye* standard and then ruled on the admissibility of claimant's proposed expert testimony. *** The arbitrator and the Commission considered all of the evidence relevant to the *Frye* issue before ruling on the admissibility of [the expert's] testimony and dealt with the issues they would have addressed had a separate *Frye* hearing been held. Therefore, we believe that the procedure employed here was appropriate."

¶ 36　　　　　After reviewing the record, we conclude Dr. Gumprecht's causation opinion is not based on a scientific methodology or principle that has gained general acceptance in the relevant

scientific community, and it was therefore inadmissible under *Frye* and Rule 702. Dr. Gumprecht's causation opinion was based fundamentally on two publications, only one of which was peer-reviewed, regarding diacetyl exposure at microwave popcorn plants. In particular, Dr. Gumprecht relied on an article published in the New England Journal of Medicine that, according to him, concluded butter flavoring components, specifically diacetyl, caused bronchiolitis obliterans in exposed workers. However, we note Dr. Gumprecht did not opine that claimant suffered from bronchiolitis obliterans, and, therefore, the New England Journal of Medicine article fails to support his causation opinion. Further, Dr. Gumprecht acknowledged he did not even know whether claimant was exposed to the same injurious product used at the microwave popcorn plants studied in the article. As pointed out by Dr. McCunney, the NIOSH evaluation of the ADM plant in Decatur indicated there was no comparative risk to lung disease *vis-a-vis* the microwave popcorn plant workers.

¶ 37        Next, Dr. Gumprecht cited an editorial published in the American Journal of Respiratory and Critical Care Medicine that he noted was "getting toward the concept of general acceptance." While this editorial was not a peer-reviewed article, Dr. Gumprecht relied heavily on it. According to Dr. Gumprecht, the editorial concluded "bronchiolitis obliterans was simply an outlier that made it possible to recognize that the exposure [to diacetyl] caused lung disease, but that probably the majority of patients don't have just bronchiolitis obliterans, that it can cause a more garden variety of COPD." As pointed out by Dr. McCunney, however, an editorial in a medical journal is not the equivalent of a peer-reviewed article based upon medical studies. This editorial was insufficient to serve as a basis for Dr. Gumprecht's causation opinion, as it was not established to be the type of medical literature reasonably relied upon by experts in the field.

¶ 38        In addition, Dr. Gumprecht opined the mere smell of butter flavoring containing

diacetyl was evidence of sufficient exposure to cause claimant's lung disease. However, Dr. Gumprecht acknowledged on cross-examination he had very little information regarding the frequency of claimant's exposure to the butter-flavoring smell, the period of time in which claimant might have been exposed to diacetyl-containing ingredients, and which butter-flavoring ingredients used at the ADM plant in Decatur actually contained diacetyl. This final basis for Dr. Gumprecht's causation opinion appears to be based solely on supposition. Dr. Gumprecht identified nothing in the medical literature upon which he relied that would support the theory. Further, Dr. Gumprecht's "smell theory" was roundly criticized by Dr. McCunney in his testimony. Dr. McCunney explained the odor threshold of diacetyl was 7000 times lower than the toxic levels associated with bronchiolitis obliterans found in the microwave popcorn plant workers.

¶ 39        In short, Dr. Gumprecht's causation opinion was based on a speculative theory and lacked support in the relevant scientific literature. While there may be evidence that exposure to diacetyl can cause bronchiolitis obliterans, Dr. Gumprecht's leap to finding a causal connection between diacetyl exposure and COPD is arguably supported only by an editorial, not a peer-reviewed article, that, by his own admission was only "getting toward the concept of general acceptance." We find claimant failed to establish Dr. Gumprecht's causation opinion was based on a scientific methodology or principle which has gained acceptance in the relevant scientific community. Accordingly, if indeed the arbitrator ruled Dr. Gumprecht's causation opinion was inadmissible, we would agree with the ruling.

¶ 40        Claimant next argues that the Commission's finding he did not suffer an occupational disease was against the manifest weight of the evidence.

¶ 41        "To recover compensation under the Act, a claimant must prove both that he or

she suffers from an occupational disease and that a causal connection exists between the disease and his or her employment." *Bernardoni*, 362 Ill. App. 3d at 596, 840 N.E.2d at 312. An occupational disease is defined as "a disease arising out of and in the course of the employment or which has become aggravated and rendered disabling as a result of the exposure of the employment. Such aggravation shall arise out of a risk peculiar to or increased by the employment and not common to the general public." 820 ILCS 310/1(d) (West 2004).

¶ 42 When making its factual determinations, it is within the province of the Commission to weigh the evidence and draw reasonable inferences therefrom. *Freeman United Coal Mining Co. v. Illinois Workers' Compensation Comm'n*, 386 Ill. App. 3d 779, 782-83, 901 N.E.2d 906, 910 (2008). A reviewing court will not overturn a factual determination of the Commission unless it is against the manifest weight of the evidence. *Id*. at 783, 901 N.E.2d at 910. A decision is against the manifest weight of the evidence only where the opposite conclusion is apparent. *St. Elizabeth's Hospital v. Workers' Compensation Comm'n*, 371 Ill. App. 3d 882, 887, 864 N.E.2d 266, 272 (2007).

¶ 43 As noted, claimant bore the burden of proving he suffered an occupational disease. The only evidence presented by claimant, however, to support a finding of causation between his exposure to diacetyl and his COPD diagnosis was the medical opinion of his treating physician, Dr. Gumprecht—an opinion we find was inadmissible under *Frye* and Rule 702.

¶ 44 We further note the Commission found claimant was not a credible witness. The record reflects claimant's testimony regarding his exposure to diacetyl was not consistent with the evidence. For example, claimant told Dr. Parmet that he poured 12 to 15 buckets of butter flavoring into the tanks per day. At arbitration, claimant stated he poured 12 to 15 buckets of butter flavoring into the tanks per week. However, the employer introduced batch records that

- 16 -

showed claimant added butter flavoring to the tanks on only 26 dates during his last 16 months of employment. Further, Richardson disputed claimant's testimony that he was regularly exposed to diacetyl when he completed certain work tasks, including changing oil filters, cleaning spillage from the floors, and cleaning the combinators. According to Richardson, the butter flavoring was too thick to enter the oil filters and the other tasks would typically not have been completed by someone in claimant's position. Further, despite claimant's claim that the steel buckets containing butter flavoring were not always sealed with a lid, Singleton testified that to her knowledge, "there was always a lid" to protect food integrity. Moreover, the record shows that diacetyl was only used in 2% to 3% of the butter flavoring used at the employer's plant and claimant had no knowledge of which butter flavoring he had contact with contained diacetyl.

¶ 45    Next, the Commission found Dr. McCunney's medical opinions persuasive. We find the record supports the Commission's decision. As noted, despite claimant's contention in his brief, the record affirmatively shows that he was never diagnosed with bronchiolitis obliterans, the occupational lung disease linked to prolonged exposure to diacetyl in microwave popcorn plant employees. Rather, both Dr. Gumprecht and Dr. McCunney diagnosed claimant with COPD. Although Dr. Gumprecht and Dr. McCunney agreed that a lung biopsy—which was not done here—is required for a definite diagnosis of bronchiolitis obliterans, Dr. McCunney found it notable that none of claimant's CT scans demonstrated the heterogeneous mosaic pattern that he would expect to see in patients with bronchiolotis obliterans. Rather, Dr. McCunney, who reviewed claimant's medical history, performed an independent medical examination of claimant, and visited the employer's plant, attributed claimant's COPD to a variety of factors, including his smoking history, asthma, obesity, and family history. Even Dr.

Gumprecht agreed that claimant's CT scans showed generalized emphysema commonly seen in smokers.

¶ 46    Based on the above, claimant failed to show that he suffered an occupational disease. Accordingly, the Commission's finding on this issue was not against the manifest weight of the evidence.

¶ 47                III. CONCLUSION

¶ 48    For the reasons stated, we affirm the circuit court's judgment confirming the Commission's decision.

¶ 49    Affirmed.